IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-30616
_____


UNITED STATES OF AMERICA,

                         Plaintiff-Appellee-Cross-Appellant,

                    versus

DAVID R. WALTERS,

                         Defendant-Appellant-Cross-Appellee,

                     and

M. W. HART aka Webb Hart,

                              Defendant-Appellant.
_____

Appeal from the United States District Court for the
              Eastern District of Louisiana

_____

June 26, 1996

Before JOLLY, JONES and BENAVIDES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

     David R. Walters and M. W. "Webb" Hart were convicted after a
joint trial for mail fraud, money laundering and conspiracy.  The
prosecution charged, and the jury found, that Walters and Hart
concocted an elaborate scheme to conceal the nature and source of
payments made to Hart, a member of the governing body of St.
Tammany Parish (the "Parish"), by the Parish's insurance company.
Walters was employed by the insurance company.  The government

charged that the purpose of the Hart-Walters scheme was to defraud the Parish of money, i.e., the fees secretly paid to Hart. On appeal, the defendants contend that sufficient evidence does not support their convictions because the Parish was not defrauded of any property inasmuch as the Parish received precisely the insurance coverage that it bargained for at precisely the price it agreed to pay. They further argue on appeal that there was no intent to deceive because the insurance company's invoice disclosed "administrative charges" in the precise amount paid to Hart. They also argue that the district court abused it discretion by denying their motions for severance. The government cross-appeals Walters' sentence, contesting the district court's decision to depart downwardly from the Sentencing Guidelines. We find no merit in any of these challenges, and therefore affirm the convictions and sentences.

I

The Parish of St. Tammany, Louisiana is governed by a police jury (the "Police Jury"). In 1987, the Parish was seeking a comprehensive insurance policy. Aware of the Parish's needs and hoping to garner a "birddog fee" of 10% of the insurance premium charged, Hart, an insurance agent and owner of Hart Risk Consultants, Inc., contacted Walters, a salaried employee of Arthur J. Gallagher & Co. ("Gallagher"). Walters agreed to submit a bid on the Parish's insurance. At an October 7, 1987 meeting of the finance committee of the Police Jury, at which Hart was present,

-2-

Walters presented the Gallagher package to the committee. Gallagher's bid consisted of a single sheet summarizing the total cost of the package, $322,000. It included a separate line-item charge for "administrative charges" in the amount of $31,500. No one ever questioned these charges. As presented, Gallagher's insurance package would cost the Parish approximately $400,000 per year less than it paid in 1986. The committee voted to accept the package.

In November, the Parish purchased the insurance program proposed by Gallagher. Pursuant to Gallagher's policy against sharing commissions and a November 12, 1987 letter of understanding between Gallagher and Hart, Hart was to invoice separately for his fees. In connection with its purchase, however, the Parish received a single invoice from Hart Risk Consultants, Inc. Apparently, Gallagher issued an invoice in the Parish's name that reflected all costs except the $31,500 "administrative fee" included in the bid, and forwarded it to Hart. Hart retyped the figures onto his own invoice, added an "administrative fee" expense of $31,500, and then delivered the consolidated invoice to the Parish. At trial, Hart confirmed that he neither negotiated his fee with the Parish nor disclosed the fact that he was receiving the fee to anyone in the Parish--he simply added the line item for "administrative fee" to the invoice he prepared, increased Gallagher's invoice price by the same amount to equal the bid price, and forwarded the invoice to the Parish. The Parish paid

Hart the full amount of the invoice, from which Hart deducted his fee. Hart paid the remaining funds to Gallagher.

Between the time of Gallagher's proposal in October and the Parish's acceptance in November, Hart was elected as a member of the Police Jury--a fact of singular importance in this case. After he took office, Hart received the following sums from Gallagher: April of 1988--$866.47; December of 1988--$32,500; November of 1989--$32,500; December of 1990--$32,500. The government contended at trial that these fees were directly tied to the insurance coverage that Gallagher sold the Parish in those years. In contrast to its 1987 policy, the Parish received invoices directly from Gallagher for the policies issued in 1988 through 1991. Gallagher's invoices during 1988 through 1990 included a separate line-item for "administrative fees" or "consulting fees" of $32,500, an amount equal to the fees paid to Hart in 1988 through 1990. In addition, Gallagher's invoice for 1991 included an "administrative fee" of $34,125, an increase corresponding to the increased fee Hart requested of Gallagher. Gallagher's check stubs variously denominated the payments as a "Brokerage Fee," a "Consulting Fee" and "St. Tammany Police Parish." The notations Hart made in his own bank book list the deposits as being for work done for the Ouachita Parish. Ouachita Parish personnel, however, testified that they had never met Hart.

At trial, Kathi Williams, Gallagher's technical assistant for the Parish account during 1987, testified that Walters told her

-4-

that Gallagher "could not show St. Tammany Parish Police Jury on [the checks to Hart] because Webb [Hart] was the police juror. . ." Kim Clark, a branch accountant for Gallagher, similarly testified that Craig Van der Voort,[1] Gallagher's Area President, instructed her to "put Ouachita Parish on [Hart's] check" because as a police juror for the Parish, Hart "wasn't supposed to have anything to do [with] the insurance." Believing that Hart had no involvement with the Ouachita Parish account, Clark refused to make this entry in Gallagher's books and instead listed "Brokerage Fee" on the check stub. Finally, in response to an inquiry in 1989 from Terrence J. Hand, a member of the Police Jury, a Gallagher receptionist stated that Hart was the agent for the Parish account--a comment that apparently initiated the investigation that led to these convictions.

While serving on the Police Jury, Hart stated to reporters that he received no compensation for the insurance Gallagher sold to the Parish, and was not doing business with the Parish because "that would be wrong." Hart made substantially the same representations to a staff investigator for the Louisiana Commission on Ethics for Public Employees and for the Board of Ethics for Elected Officials.

Walters consistently told the same story. In a 1989 letter to Grey Sexton, head of the Board of Ethics for Elected Officials for

---

[1]Van der Voort pled guilty to a one-count indictment in 1994.

the State of Louisiana, Walters stated that Hart was not an agent for Gallagher and that when Hart placed a piece of business through Gallagher, Hart remitted the "entire premium for the policy to Gallagher and collected his consulting fee separately." Walters reiterated this account of Gallagher's relationship with Hart to the staff investigator for the Board of Ethics for Elected Officials. When asked by Hand, a Police Jury member, whether Hart acted as the agent for the Parish's account as Gallagher's receptionist had indicated, Walters stated that Hart had nothing to do with the Parish account.

A crucial piece of evidence introduced by the government was an affidavit regarding conflicts of interest that the Parish forwarded to Gallagher on or before December 11, 1990, two days before Gallagher forwarded its last payment to Hart. Walters signed the affidavit on December 18, 1990, five days after Gallagher paid Hart. The affidavit stated that "[n]o part of [Gallagher's] contract price was paid or will be paid to any person . . . for soliciting the contract," other than payment to employees of Gallagher in the regular course of their duties.

According to Allen Cartier, the Parish's chief of staff between 1986 and 1988 and a member of the Police Jury Finance Committee, and the Parish's manager at the time of trial, the members of the Police Jury never questioned the line-item expense on Gallagher's invoices for administrative fees. Terrence Hand similarly testified that "no member of the finance committee has

ever . . . questioned a component of the cost of the package." Hand, however, also testified that "[i]f Webb Hart was getting anything with that policy, we would have never approved it."

Walters and Hart were subsequently charged in a fourteen-count indictment with conspiracy to commit mail fraud and launder money, see 18 U.S.C. § 371; mail fraud, see 18 U.S.C. § 1341; and money laundering, see 18 U.S.C. §§ 1956(a)(1)(B)(1), 1957.[2]  At trial, the district court denied the defendants' motions for severance.

The government contended at trial that Hart, Walters and Van Der Voort conspired to conceal and disguise the fact that the Parish was being billed for services that could not have been rendered by Hart because he was a police juror, and that Hart was the recipient of those fraudulently obtained funds.[3]  In his

_____

[2]Count 1 of the indictment charges the defendants with conspiracy to commit mail fraud and launder money.  Counts 2-10 charge the defendants with nine separate acts of mail fraud.  Count 2 represents the check mailed by the Parish to Gallagher on March 24, 1988, which preceded Gallagher's $866.47 payment to Hart in April of 1988.  Counts 3 and 4 represents the invoice for services sent by Gallagher to the Parish on October 21, 1988, and the Parish's remittance mailed on November 17, 1988.  Similarly, Counts 5 and 6 represent Gallagher's invoice and the Parish's check for services in 1989; Counts 7 and 8 represents the invoice and corresponding check for 1990; and Counts 9 and 10 represent the invoice and fee for 1991.

Count 11 charges the defendants with laundering the money Hart received in April of 1988; Count 12, with laundering the fee Hart received in December of 1988; Count 13, with laundering the fee Hart received in November of 1989; and Count 14, with laundering the fee Hart received in December of 1990.

The indictment does not charge Walters and Hart with money laundering during 1991, presumably because Gallagher made no corresponding payment to Hart in 1991.

[3]The indictment charges Walters and Hart with "[u]s[ing] and

defense, Hart presented evidence that the fees he received from Gallagher from 1988 through 1990 represented fees due him for countersigning other insurance policies sold by Gallagher in Louisiana, including policies sold to Ouachita Parish.

Walters testified in his defense that Gallagher continued to pay the fee to Hart because Hart represented to Van der Voort that he had made the proper disclosures to the Police Jury. Walters also contended that members of the Police Jury were so pleased with the premium savings to the Parish that they never questioned the administrative fee expense, and in any event, that it is standard industry practice to pay "birddog fees," which insurers either bury in the insurance premium or split out separately as line-items.

The jury found Hart guilty of conspiracy, mail fraud during 1988 through 1991 and money laundering during 1988 through 1990. Walters was convicted of conspiracy, mail fraud during 1990 and 1991 and money laundering during 1990. Hart was sentenced to 41 months imprisonment to be followed by three years of supervised release and ordered to pay restitution in the amount of $97,500.

---

caus[ing] to be used the United States Mail in furtherance of a scheme and artifice to defraud the St. Tammany Parish Police Jury, St. Tammany Parish and the citizens of St. Tammany Parish, State of Louisiana, and to obtain money by means of false and fraudulent pretenses. . . ." To effect the scheme, the indictment alleges that Walters and Hart took "actions in order to conceal the fact that an elected member of the [Police Jury, Hart,] was secretly receiving consulting/administrative fees to which [Hart] was not entitled and for services [Hart] did not provide to St. Tammany Parish."

Walters was sentenced to 24 months imprisonment and was ordered to pay restitution in the amount of $97,500.

Walters and Hart appeal their convictions, contending that insufficient evidence supports the convictions and that the district court abused its discretion in denying their motion for severance. The government cross-appeals Walters' sentence.

II

The defendants contend that insufficient evidence supports their convictions for mail fraud. It is fundamental that we, as an appellate court, owe great deference to a jury verdict. Therefore, in assessing a challenge to the sufficiency of the evidence, we will consider the evidence in the light most favorable to the verdict and will afford the government the benefit of all reasonable inferences and credibility choices. United States v. Ayala, 887 F.2d 62, 67 (5th Cir.1989). The evidence is sufficient if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt based upon the evidence presented at trial. Id.

To convict Hart and Walters of mail fraud, the government must have proved: 1) the existence of a scheme to defraud; 2) use of the mails to execute the scheme; and (3) the defendant's specific intent to commit fraud. United States v. Fagan, 821 F.2d 1002, 1008 (5th Cir. 1987), cert. denied, 484 U.S. 1005 (1988). The mail fraud statute protects only against schemes or artifices to defraud another of his property rights. United States v. Rico Industries,

854 F.2d 710 (5th Cir. 1988) (citing United States v. McNally, 483 U.S. 350, 107 S.Ct. 2875, 2881 (1987)). Such schemes may be aimed at tangible as well as intangible property rights. Carpenter v. United States, 108 S.Ct. 316 (1987). Here, however, the indictment only charges a scheme to defraud the Parish of a tangible property right in its own money.

Walters and Hart make a number of arguments in support of their contention that sufficient evidence does not support their convictions for mail fraud. They argue first that the Parish suffered no monetary loss and therefore that the charged scheme falls outside the mail fraud statute. Second, Walters and Hart advance several arguments to support their contention that no fraud or deception occurred and that in any event they lacked the intent to defraud. We address these separately.

A

The defendants first argue that the United States did not and in fact could not prove a loss of money to the Parish and its citizens.[4] This is true, they argue, because the record is devoid of evidence that the Parish paid more for its insurance package than otherwise it would have. Furthermore, the defendants argue

---

[4]Significantly, the government does not allege that the Walters-Hart scheme deprived the citizens of the Parish of their right to Hart's honest services.

that the Parish received exactly the insurance package it bargained to receive at the price it agreed to pay.[5]

We find this challenge to be without merit. We can, however, agree that the ultimate question for the jury to have resolved was whether the Parish was defrauded of money that it otherwise would not have paid--not merely whether Gallagher secretly paid a fee to Hart from the insurance premium that the Parish knowingly and willingly paid to Gallagher. Obviously, if the evidence plainly showed that, even if disclosed to the Parish, Gallagher would have retained Hart's fee as part of its profit from the sale, the Parish would not have suffered a money loss as alleged in the indictment. We are persuaded, however, that the government offered ample evidence from which the jury reasonably could infer that the concealment of the illegal payments to Hart effectively raised the cost of the insurance to the Parish.

First, it is undisputed that, because Hart was a member of the Police Jury, Gallagher's payments to Hart could not legally have been made. Second, Terrence Hand, a member of the Police Jury, specifically testified that "[i]f Webb Hart was getting anything with that policy, we would have never approved it." The jury thus reasonably could infer from the illegality of the payments and from Hand's statement that the Police Jury would have contested or even

---

[5]Hart articulates this point differently when he argues that "Gallagher obtained th[e] funds [paid to him] based upon its legal contract with the police jury and was free to distribute those funds as Gallagher saw fit."

refused to pay the $31,500 "administrative fee" if Gallagher had clearly denominated it as an "administrative fee for Webb Hart." Indeed, there is ample evidence from which a jury reasonably could infer that Walters and Hart knew that the Parish would refuse to pay Hart's fee if disclosed, to wit, Walters' and Hart's repeated denials that Gallagher was making payments to Hart, Walters' explicit instructions to Kathi Williams that Gallagher "could not show St. Tammany Parish Police Jury" on the checks to Hart, and Hart's own notations in his bank book listing the fees as being for other work.

Finally, and perhaps most importantly, there is ample evidence from which the jury reasonably could infer that if the Parish had contested the fee, Gallagher would have reduced the Parish's insurance premium by a like amount. Specifically, in December of 1990, only five days after forwarding Gallagher's payment to Hart, Walters signed an affidavit submitted to him by the Parish in which he stated that Gallagher had not and would not pay any solicitation fee in connection with the Parish's insurance. Walters' express acknowledgment in that affidavit that solicitation fees were "not part of [Gallagher's] contract price" indicates that in the light of a full disclosure the Parish's premium price would have been reduced by an amount equal to Hart's fee.

Thus, considering the evidence in the light most favorable to the verdict and affording the government the benefit of all reasonable inferences and credibility choices, we conclude that the

-12-

government adduced sufficient evidence that Gallagher's payments to Hart inflated the cost of the Parish's insurance, over and above what the Parish--in the light of full disclosure--would have been willing to pay.[6]

---

[6]Hart argues that the conviction lacks sufficient evidence because the fees at issue represent countersigning fees on other Gallagher policies. The jury surely did not have to accept such a contention. Ouachita Parish personnel testified that they had never met Hart. Moreover, Gallagher's own receptionist identified Hart as the agent for the St. Tammany Parish account when asked by a member of the Police Jury. In addition, Gallagher's branch accountant testified that Ouachita Parish was put on Hart's check because Hart "wasn't supposed to have anything to do [with] the [St. Tammany Parish] insurance." Plainly, the jurors reasonably concluded that Gallagher's payments to Hart in 1988 - 1990 represented commissions for the St. Tammany Parish account.

Moreover, the jury reasonably could conclude that Gallagher's payment to Hart constituted fees for soliciting or acting as a "birddog" for the Parish account. Hart's own defense is premised on the fact that he rendered no administrative services for the Parish account during 1988 - 1990. In addition, Hart legally could not render administrative services to the Parish while serving as a member of its Police Jury.

Walters and Hart next argue that no deceit or fraud occurred because Gallagher's invoices to the Parish disclosed all costs, including the fees paid to Hart. Essentially, the defendants argue that the line-item description of the charge as an "administrative fee" or "consulting fee" is an adequate and fair description of the charge.

This challenge, too, is without merit. The relevant deception or fraud here is not the amount of the payment, but to whom it was paid. Walters and Hart are charged with taking "actions in order to conceal the fact that an elected member of the [Police Jury, Hart,] was secretly receiving consulting/administrative fees to which [Hart] was not entitled and for services [Hart] did not provide to St. Tammany Parish." The affidavit signed by Walters stated that "[n]o part of [Gallagher's] contract price was paid or will be paid to any person . . . for soliciting the contract," other than payment to employees of Gallagher in the regular course of their duties. In short, the jury reasonably could have concluded that by concealing the fact that Gallagher made payments to Hart, the Parish made payments precluded by Louisiana law, which it otherwise would not have made, and as to which Walters assured the Parish it had not made and would not be required to make. Thus, Gallagher's disclosure of a $31,500 "administrative fee"-- without more--does not suffice to remedy the calculated,

coordinated deceit of the Parish as to the nature of those payments.

C

Finally, in a similar vein, Walters argues that he lacked the intent to defraud the Parish because he believed, as Hart had represented, that Hart had made the proper disclosures to the Police Jury, thus making it ethical for Hart to continue to receive the fee.

We again are not persuaded. Kathi Williams testified that Walters told her that Gallagher "could not show St. Tammany Parish Police Jury on [the checks to Hart] because Webb [Hart] was the police juror . . ." It is further undisputed that Walters repeatedly represented to members of the Police Jury and officials and staff investigators of the Louisiana Board of Ethics for Elected Officials that Hart was not an agent for Gallagher and that when Hart placed a piece of business through Gallagher, Hart remitted the "entire premium for the policy to Gallagher and collected his consulting fee separately." All of this incriminating evidence is consistent with Walters' own incriminating affidavit to the Parish in which he stated that "[n]o part of [Gallagher's] contract price was paid or will be paid to any person . . . for soliciting the contract." This host of denials by Walters reasonably could lead the jury to reject his contention that he believed all along that Hart had made the proper disclosures to the Police Jury.

-15-

D

In sustaining the defendants' convictions for mail fraud, we are mindful that the payment of "birddog fees" is a common practice in the insurance industry, as it is in other industries. The result we reach today, however, does nothing to disturb the legitimate and expedient practice of paying solicitation fees, which are often folded into a bottom line cost. We hold only that, assuming all other elements and evidence to support a conviction, a mail fraud conviction may be sustained when a defendant devises a deceitful scheme to cloak the payment of solicitation fees that it has pledged not to make.

III

Hart and Walters next contend that the district court abused its discretion by denying their motion for severance. We review the district court's denial of a motion for severance for abuse of discretion. United States v. Rocha, 916 F.2d 219, 227 (5th Cir. 1990), cert. denied, ___ U.S. ____, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991). "To demonstrate an abuse of discretion, a defendant must show that he suffered specific and compelling prejudice against which the district court could not provide adequate protection, and that this prejudice resulted in an unfair trial." Id.

In Zafiro v. United States, the Supreme Court indicated that a severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment

about guilt or innocence." ___ U.S. ___, 113 S.Ct. 933 (1993). Neither a qualitative disparity in the evidence nor a prejudicial spillover effect is sufficient in and of itself to warrant a severance. U.S. v. Mitchell, 31 F.3d 271, 276 (5th Cir.), cert. denied, ___ U.S. ___, 115 S.Ct. 455 (1994).

Although Zafiro recognized that the risk of prejudice is heightened when the defendants have markedly different degrees of culpability, it also noted that limiting instructions often will suffice to cure the risk of prejudice. Id. at 938. As with their arguments as to sufficiency of the evidence, Hart and Walters make different claims of compelling prejudice. We address them separately.

A

Hart asserts that the joint trial resulted in compelling prejudice to him because Walters sought to prove that he was a liar; the only way to assure that the jury made a reliable judgment about his guilt or innocence, Hart argues, was to grant him a separate trial. We cannot agree. In United States v. Stouffer, we considered whether the district court abused its discretion in denying a defendant's request for severance where counsel for one defendant during closing arguments made damaging statements regarding the culpability of his co-defendant. 986 F.2d 924 (5th Cir. 1993). Even though we assumed for purposes of argument that co-defendants at trial "present[ed] antagonistic defenses," we nevertheless concluded that "severance was not warranted." Id.

-17-

The district court instructed the jury to consider the evidence as to each defendant "separately and individually," and not to consider comments made by counsel as substantive evidence. Id. We held that these instructions sufficed "to cure any prejudice caused when co-defendants accuse each other of the crime." Id. (citing Zafiro v. United States, ___ U.S. ____, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993)).

Hart's assertion of prejudice here does not differ qualitatively from the prejudice assumed to exist in Stouffer. As in Stouffer, the district court instructed the jury to consider separately the evidence presented as to each defendant and each count. In fact, the jury acquitted both Hart and Walters on several counts of the indictment, suggesting that they heeded the court's instructions. See United States v. Ellender, 947 F.2d 748, 755 (5th Cir. 1991). We conclude therefore that Hart fails to demonstrate compelling prejudice entitling him to severance.

B

Walters argues that the joint trial resulted in compelling prejudice to him because the government was able to introduce correspondence between Hart and the Louisiana State Ethics Board that it could not have introduced if he had been tried separately.[7]

---

[7]Walters also argues that he suffered compelling prejudice because (a) Hart's counsel attacked his credibility during closing arguments and (b) Walters was required to counter two sets of facts--the government's and Hart's--rather than one. Walters thus complains that he and Hart presented mutually antagonistic defenses. For the reasons stated earlier, we conclude that the

-18-

Although Walters argues that this evidence is irrelevant to the charges against him, we find it probative of Walters' involvement in the mail fraud offense, a central feature of which was the misrepresentations made by both Hart and Walters to the Louisiana Ethics Board.  Terrence Hand testified that, after a newspaper reporter inquired in his presence about an advisory opinion of the Louisiana Ethics Board finding no misconduct by Hart, Hart stated to Hand, "See, I told you I was going to be cleared."  Because Walters is charged with conspiring with Hart to defraud the Parish, this evidence arguably would have been admitted at any trial of Walters, whether separate or joint.  Even if this evidence would have been inadmissible at a separate trial, however, "severance is not required merely because the government introduced evidence admissible against certain defendants." U.S. v. Neal, 27 F.3d 1035 (5th Cir. 1994).

Moreover, we are persuaded that the district court's instructions to the jury cured any possible prejudice resulting from the "spillover" of evidence.  The jury acquitted Walters on numerous charges, demonstrating that the jury followed the court's instructions to consider the evidence separately as to each defendant.  See id.  We conclude therefore that Walters has not

district court's limiting instructions to the jury cured any prejudice that resulted to Walters as a result of Hart's antagonistic offense.

shown specific and compelling prejudice as a result of the denial of severance.

IV

Finally, we consider the government's cross-appeal as to Walters' sentence of 24 months for money laundering. U.S.S.G. § 2S1.2.[8] The government asserts that the district court erred in relying on comment 10 of § 2F1.1, governing fraud, forgery and counterfeiting, to depart downwardly from the applicable sentencing range of 30-37 months. See U.S.S.G. § 2F1.1 cmt. 10 (1993).[9] Walters insists that comment 10 is a legally valid basis for the district court's departure, which he asserts needs only to be reasonable. Departure was reasonable, Walters urges, because the

---

[8]The court explained its departure, stating:

> The defense has urged a downward departure on the basis that this is not a typical case of mail fraud or money laundering. *I'm not going to downward depart on that basis*, but I am, however, going to grant a downward departure for a more specific reason. Guideline 2F1.1 allows for a departure when the amount of loss calculation which is used to assess the offense level either understates or overstates the seriousness of the particular defendant's conduct.

(Emphasis added.) The court then concluded that because Walters received no proceeds, he should receive a lesser sentence.

[9]Comment 10 to § 2F1.1 provides:
In a few cases, the loss determined under subsection (b)(1) may overstate the seriousness of the offense . . . . In such cases, a downward departure may be warranted.

U.S.S.G. § 2F1.1 cmt. 10 (1993).

district court obviously believed that the punishment was disproportionate to the "real offense conduct."

We find it unnecessary to address the government's argument that comment 10 may not serve as a valid ground of departure here, because it is apparent to us that the district court would have imposed the same sentence irrespective of the legal error asserted by the government. See Williams v. United States, 112 S.Ct. 1112, 1120 (1992) (holding that when a district court has intended to depart from the guideline range, remand is required only if the sentence would have been different but for the district court's misapplication of the guidelines).

The district court unmistakably determined that Walters deserved mitigation:

> [S]ince Mr. Walters himself did not receive any of the misappropriated funds, that the guideline calculation therefore overstates the seriousness of his own involvement, and for that reason the incarceration portion of the sentence will be reduced.

Moreover, Section 5k2.0 provides a statutory basis for the desired departure. Section 5k2.0 permits a district court to depart from the applicable sentencing range if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b) (1994). Here, the sentencing guideline for money laundering and its commentary make no mention of the failure to receive a personal benefit as a mitigating factor. See U.S.S.G. § 2S1.1. Moreover,

we are satisfied that the departure is reasonable.  See Williams, 112 S.Ct. at 1120.  The downward departure was for only six months, leaving Walters with a two-year prison sentence.  The reduction is not disproportionate in the light of the district court's conclusion that the "guideline calculation overstates the seriousness of [Walters'] involvement."

Consequently, because we find that the district court would have imposed the same sentence irrespective of the legal error asserted by the government, we affirm Walters' sentence.[10]

V

For the reasons we have stated in this opinion, the defendants' convictions and sentences are

A F F I R M E D.

---

[10]Our conclusion that the district court's sentence should not be disturbed is all the more buttressed by the recent Supreme Court case of Koon v. United States, which emphasized in the strongest terms that the appellate court rarely should review de novo a decision to depart from the Sentencing Guidelines, but instead should ask whether the sentencing court abused its discretion.  ___ U.S. ___, 1996 WL 315800 (1996).