REVISED, July 21, 1998
**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 96-50512

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ERNEST CORTINAS, also known as Neto; RICARDO
RODRIGUEZ, also known as Uncle Richard, also known
as Mangas; HENRY C. VILLEGAS; DANIEL CHAVEZ
VILLEGAS, also known as El Gordo; JOHNNY ALBERT
MARTINEZ, also known as Red Rider; LINDA RODRIGUEZ,
also known as Linda Rodriguez Mata; ERIC WAYNE GREEN,

Defendants-Appellants.

Appeals from the United States District Court
For the Western District of Texas

May 22, 1998

Before POLITZ, Chief Judge, DeMOSS, Circuit Judge, and FITZWATER,[*] District
Judge.

POLITZ, Chief Judge:

Ernest Cortinas, Ricardo Rodriguez, Henry C. Villegas, Daniel Chavez
Villegas, Johnny Albert Martinez, Linda Rodriguez Mata, and Eric Wayne Green
were convicted of conspiracy and various substantive offenses arising out of a
marihuana distribution enterprise. They challenge on appeal, *inter alia*, the
admissibility of certain evidence, the denial of various motions to sever, the
sufficiency of the evidence, and the trial court's sentencing findings as to the
amount of marihuana involved in the offenses. For the reasons assigned, we affirm

---

[*]District Judge of the Northern District of Texas, sitting by designation.

in part and vacate and remand in part.

## BACKGROUND

The appellants' convictions are related to a drug smuggling organization headed by Daniel Nieto. In 1984, Nieto began storing marihuana at Metro Transmissions, his place of business in San Antonio, and eventually expanded his involvement in the drug trade to become a major distributor of marihuana between San Antonio and Saginaw, Michigan. Nieto bought marihuana from Arturo Villareal which was delivered to Metro Transmissions by Rodriguez, Villareal's uncle. On several occasions members of Nieto's organization paid Mata, Villareal's sister, for the marihuana. The relationship between Nieto and Villareal ended in 1989 and Nieto acquired another marihuana source.

As his operations grew, Nieto hired a number of people, including Martinez, to transport the marihuana, using Dan's Paint and Body Shop, a San Antonio business, as a front. Employees of Dan's would fit vehicles with concealed compartments, do touch up paint and body work to conceal the compartments, and load and unload marihuana. Henry Villegas was the owner and Daniel Villegas was an employee of Dan's. Both were members of the Southsiders Bikers Club, a boot camp organization for the Bandido Nation Motorcycle Club.

In 1989, encountering problems collecting from some Michigan customers, Nieto enlisted the services of Cortinas, a small-time customer, and other members of the San Antonio Chapter of the Bandido Nation Motorcycle Club to assist in the collection effort. In the process of collecting one such account, in September 1991

2

Cortinas and fellow Bandido members Edward Salas and Green, reportedly "shot up" the house of a delinquent debtor. The shooting resulted in the death of a 14-year-old boy. The house was under the "protection" of a Michigan motorcycle club, the Outlaws, and in order to prevent retaliation the Bandidos obtained $25,000 from Nieto to give to the Outlaws. Nieto testified that the Bandidos eventually took over his business and that he acquiesced in that takeover because he feared for his life and the life of his family.

Nieto was arrested in May 1992 along with several confederates. Nieto and others plea bargained for reduced sentences in return for information and testimony against other members of the organization. In January 1995, 28 members of Neito's organization were indicted for conspiracy with intent to distribute marihuana, in violation of 21 U.S.C. § 841(a)(1) and § 846, and various other substantive offenses. A jury found all appellants guilty on the conspiracy count.[2] Mata was also convicted of conspiring to launder drug money proceeds in violation of 18 U.S.C. § 1956. The jury acquitted Martinez of conspiring with Edward Jesse Rodriguez[3] to distribute marihuana. The appellants timely appealed.

**ANALYSIS**

Appellants assert the following claims of error: (1) the district court abused

---

[2] Of the 27 defendants named in the superseding indictment, ten went to trial: the seven appellants at bar along with Edward Salas, Jesse David Rodriguez and Janet Westover Torrez. Salas was dismissed by the government after it rested. Jesse David Rodriguez was found not guilty, and Torrez, although convicted, is not a party to this appeal.

[3] Edward Jesse Rodriguez was a fugitive and was not tried.

3

its discretion in admitting evidence of the Bandido's methamphetamine trafficking, the Michigan shooting and the Bandido's tactics and philosophy; (2) the district court erred in refusing to sever the trials of Rodriguez, Mata, Henry Villegas, and Daniel Villegas; (3) the evidence was insufficient to support the convictions of Cortinas, Rodriguez, Daniel Villegas, Martinez, Mata, and Green; (4) the district court abused its discretion in denying Cortinas' request for an alibi jury instruction; (5) the government gave Cortinas and Green inadequate notice of its intention to seek an enhanced penalty under § 841(b) which constituted a denial of due process; (6) the quantity of marihuana for which Cortinas was held accountable was not properly determined; (7) the district court erred in enhancing Cortinas' sentence based upon his alleged leadership role in the conspiracy and for possession of a firearm; and (8) Henry Villegas' trial counsel rendered ineffective assistance. We consider these issues in that order.

I.    Admissibility of Evidence

Several of the appellants contend that some of the evidence presented at trial was inadmissible. They properly objected at trial, preserving error on these points, and we review applying the abuse of discretion standard.[4]

A. Methamphetamine Trafficking

Cortinas and Green complain about the admission of testimony by Jay Lane Roberts, a Bandido National Officer, that he periodically sold to them

---

[4]**See United States v. Speer**, 30 F.3d 605 (5th Cir. 1994).

methamphetamine in quantities sufficient for resale.[5] The admissibility of extrinsic evidence is governed by Fed. R. Evid. 404(b) which allows the introduction of such evidence for purposes other than to show that the defendant acted in conformity therewith. Interpreting that rule, we have applied a two-step test. "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403 . . . ."[6]

This evidence was admitted properly under Fed. R. Evid. 404(b) and 403. The extraneous drug evidence, trafficking in methamphetamine, necessarily entails the same knowledge or intent to traffick in marihuana, the controlled substance at issue herein. Furthermore, we previously have held that "proof of prior drug activities is more probative than prejudicial."[7] The district court did not abuse its discretion in admitting this evidence.[8]

B. Bandido's Tactics and Philosophy

Cortinas, Rodriguez, and Martinez contest the admission of general

---

[5]Roberts also testified that at a point in his dealings with Cortinas the relationship changed and Cortinas became his supplier of methamphetamine. He also testified that Green had sold him methamphetamine.

[6]**United States v. Beechum**, 582 F.2d 898, 911 (5th Cir. 1978)(en banc).

[7]**United States v. Harris**, 932 F.2d 1529, 1534 (5th. Cir. 1991).

[8]It should also be noted that the jury was cautioned immediately after Roberts' direct examination that the evidence of the methamphetamine trafficking could only be considered against Cortinas and Green.

testimony about the culture, activities, and tenets of the Bandidos. Roberts described the "gang" as being into "motorcycles and crime. Mainly methamphetamine, . . . stolen motorcycles, prostitution, strong arm, theft, drugs, [and] violence." He explained that the gang associated with "characters"--successful, nonmember criminals--and attempted to take control of their criminal enterprises and money. This testimony illustrated the "talents" of the Bandidos that led Nieto to employ the organization in his debt collection efforts. Additionally, it supports the reasonable inference that members of this gang could form the requisite intent to engage in an illegal enterprise. Thus, the district court did not abuse its discretion in admitting this testimony.

C. Michigan Shooting

In 1991, Frances O'Valle, one of Nieto's Michigan customers, owed Nieto for marihuana that had been "fronted" to her.[9] Nieto employed the Bandidos to collect this debt. O'Valle told of difficulties she was experiencing collecting from a customer and complained to Nieto about the debt collectors' strong arm tactics. Nieto promised O'Valle that she would be left alone if she would give the address of her delinquent customer, one Forest Zudell. The address was given and Zudell's house in Mount Morris Township, Michigan was "shot up," and a 14-year-old boy was killed. The police investigation determined that the shots had been fired by three gunmen from three different angles. The government maintained that Cortinas, Green, and co-defendant Salas were the three responsible for the

---

[9]Marihuana would be delivered to Nieto's customers who would pay in cash a short time later.

6

shooting. The government introduced evidence of the debt, the shooting, and the results of the Mount Morris Police Department's investigation which led them to conclude that Cortinas, Green, and Salas were the gunmen.

Appellants contend that the district court abused its discretion in admitting this highly inflammatory and potentially prejudicial evidence. Although the district court did not allow evidence of the death that resulted from the shooting, appellants maintain that the testimony implied, and in fact led the jury to believe, that someone was killed in the incident. We are not persuaded.

The shooting incident was admitted properly as an intrinsic act in furtherance of the conspiracy.[10] The violence was part of the effort to collect money owed for marihuana that had been delivered to one of Nieto's customers. Additionally, and most importantly, any undue prejudice was avoided by disallowing evidence of the death of the 14-year-old boy. The court's admission of this evidence was not error.

Appellants who were not members of the Bandidos[11] contend that even if this evidence was properly admitted as to those involved in the incident, the district court failed to craft an adequate limiting instruction to preclude the jury from considering that evidence as to them. The appellants, however, did not object to these instructions as being erroneous or inadequate, nor did they propose that other, preferable limiting instructions should have been given. We, therefore, may review

---

[10]**See United States v. Maceo**, 947 F.2d 1191 (5th Cir. 1991)(evidence of an uncharged offense arising out of the same transactions as the offenses charged in the indictment is not extrinsic evidence within the meaning of Rule 404(b)).

[11]Rodriguez, Mata, Henry Villegas, Daniel Villegas, and Martinez were not members of the Bandidos.

only for plain error.[12]  We find none.

II.     Severance

Prior to trial, Rodriguez,[13] Mata, and Henry and Daniel Villegas filed separate motions for severance under Fed. R. Crim. P. 14, contending that much of the evidence that would be introduced at trial was irrelevant and so highly prejudicial to their case as to undermine their right to a fair trial.  We review denial of a Rule 14 motion for an abuse of discretion.[14]  The appellants must show that they "suffered specific and compelling prejudice against which the trial court was unable to afford protection, and that this prejudice resulted in an unfair trial."[15]

Rodriguez and Mata contend that they were prejudiced by the testimony of the Bandido's tactics and activities, including the highly inflammatory evidence of the Michigan shooting.  Although "persons jointly indicted in a conspiracy case should generally be tried together,"[16] we must conclude that Rodriguez' and Mata's motions for severance should have been granted.  Neither Rodriguez nor Mata was associated with the Bandidos.  In fact, the record reflects that their charged involvement with Nieto ended in 1989, prior to the Bandido's joining the conspiracy.  After 1989, Nieto obtained another source of marihuana and no longer

---

[12]Fed. R. Crim. Proc. 52(b).

[13]Rodriguez asserts this error on appeal by adoption.

[14]**See United States v. Restrepo,** 994 F.2d 173 (5th Cir. 1993); **United States v. Toro**, 840 F.2d 1221 (5th Cir. 1988).

[15]**Toro** at 1238.

[16]**United States v. Scott**, 795 F.2d 1245, 1250 (5th Cir. 1986).

used Villareal, Mata's brother and Rodriguez' uncle, as his supplier.[17]  Limiting instructions given by the trial judge were inadequate to mitigate the prejudicial effect of the overwhelming testimony regarding the violent, criminal activities of the Bandidos.  Accordingly, the convictions of Rodriguez and Mata are vacated and as to them, the matter is remanded to the district court for further proceedings consistent herewith.

Henry and Daniel Villegas also contend that they were prejudiced by the Bandido evidence.  The evidence showed, however, that both were members of the Southsiders Motorcycle Club, a boot camp organization for the Bandidos.  Their alleged involvement with Nieto coincided with the Bandido collection efforts.  Our review of the record persuades that the trial judge did not abuse his discretion in refusing to sever these defendants.

III.  Sufficiency of the Evidence

All appellants, with the exception of Henry Villegas, contend that the evidence was insufficient to support their convictions.  In reviewing such challenges we view the evidence in the light most favorable to the jury's verdict and affirm if a rational trier of fact could have found that the government proved all essential elements of a crime beyond a reasonable doubt.[18]  Credibility determinations and reasonable inferences are resolved in favor of the jury's

---

[17]The record contains evidence of payments for real estate used by Mata and Villareal in the alleged money laundering scheme that post date 1989.  These payments, however, were not tied to the Bandidos' activities.

[18]**See United States v. Puig-Infante**, 19 F.3d 929 (5th Cir. 1994).

9

verdict.[19]

Cortinas, Daniel Villegas, Martinez, and Green challenge the sufficiency of the evidence supporting their convictions for conspiracy to possess with intent to distribute marihuana.[20] Necessary elements of the conspiracy are: (1) the existence of an agreement to possess marihuana with the intent to distribute, (2) knowledge of the agreement, and (3) voluntary participation in the agreement.[21] Although mere association or presence alone are insufficient to prove knowing participation in the agreement,[22] when combined with other relevant circumstantial evidence these factors may constitute sufficient evidence to support a conspiracy conviction.[23]

We find that the evidence of record is adequate to support a reasonable inference that each of these appellants were knowing and voluntary members of Nieto's marihuana distribution enterprise. A National Bandido Officer and Nieto, himself, testified that Cortinas worked as a debt collector and enforcer for Nieto. Cortinas was introduced to Nieto's customers and associates as an employee, and Nieto's bookkeeper testified that Cortinas was paid for his services. Additionally,

---

[19]**Id.**

[20]Rodriguez and Mata also challenge the sufficiency of the evidence. Because of our decision regarding their motions to sever we do not address their arguments on this issue.

[21]**See United States v. Mergerson**, 4 F.3d 337 (5th Cir. 1993).

[22]**See United States v. Vergara**, 687 F.2d 57 (5th Cir. 1982).

[23]**See United States v. Williams-Hendricks**, 805 F.2d 496 (5th Cir. 1986).

10

the government's evidence showed that the Cortinases lived beyond their reported income and evidence found in various searches linked Cortinas to the drug trade.

Daniel Villegas was identified by several witnesses as an employee of Dan's Paint and Body Shop. Nieto identified Daniel Villegas by his nickname "Gordo", and testified that he worked on Nieto's vehicles constructing hidden compartments or doing body work to conceal them. Jesse Hernandez, a cooperating co-conspirator, specifically testified that he had seen Daniel Villegas painting one of the secret compartments. The evidence sufficiently supports Daniel Villegas' conspiracy conviction.

Martinez was a driver for Nieto. Frances O'Valle identified him as the person delivering marihuana to her. Luis Bermudez, O'Valle's son-in-law, also identified Martinez as having delivered marihuana to him. Additional documentary evidence, such as notations in purported drug ledgers and motel receipts from Michigan, supports the involvement of Martinez in the conspiracy.

Green was a member of the Bandidos. He accompanied Nieto to Michigan on a couple of occasions and aided Cortinas in the debt collecting. Green was a suspect in the Michigan shooting and a fellow Bandido testified that Green told him that he had received the "TCB" Bandido patch for "taking care of business" in Michigan. The evidence supports a reasonable inference that Green was a knowing and voluntary member of the conspiracy. The challenges to the sufficiency of the evidence are rejected.

IV. Alibi Jury Instruction

Cortinas contends that the district court abused its discretion in refusing to give an alibi instruction. He maintains that he presented sufficient evidence that he was at a motorcycle rally in Canyon Lake, Texas over the 1991 Labor Day weekend when the Zudell house was attacked. The evidence, however, shows only that Cortinas was last seen at the rally on Sunday morning. The shooting did not occur until the early hours of Monday morning and the jury reasonably could infer that Cortinas had time to travel to Michigan in order to participate in the shooting. We find no error in the district court's refusal to give the requested instruction.

V.     Notice of Enhanced Penalty

Cortinas and Green claim a due process violation, contending that the government gave them inadequate notice of its intention to seek an enhanced penalty under 21 U.S.C. § 841(b). This argument is without merit. Each was notified in his Presentence Investigation Report, made available seven weeks before sentencing, that he was subject to an enhanced prison term of ten years to life because the conspiracy involved more than 1,000 kilograms of marihuana, and that the government would be filing a notice of enhanced penalties. A month before sentencing the government gave each formal written notice. There was no due process violation.

VI.     Sentencing of Cortinas

A. Quantity of Drugs

Cortinas contends that the district court erred in determining the quantity of drugs for which he was responsible. At sentencing, the district court found that

12

Cortinas had participated in the conspiracy for at least 20 months during which the average amount of marihuana moved had been no less than 500 pounds. In a conspiracy case, the drug quantity for purposes of sentencing includes amounts attributable to co-conspirators' conduct in furtherance of the conspiracy as long as those amounts were reasonably foreseeable to the complaining defendant.[24] Drug quantity is a finding of fact reviewed for clear error.[25] After reviewing the record, we conclude that the determination of the quantity of drugs for which Cortinas was held accountable was not clearly erroneous.

B. Enhancement

In sentencing Cortinas, the district court assessed a two-level upward adjustment under U.S.S.G. § 2D1.1(b)(1) for possession of firearms in furtherance of the conspiracy and a three-level upward adjustment under U.S.S.G. § 3B1.1(a) for his leadership role in the conspiracy. Cortinas contends that the evidence did not support such adjustments. We review these adjustments and findings of fact for clear error.[26] Finding no such error, we reject this challenge.

VII. Ineffective Assistance of Counsel

Henry Villegas maintained that he received ineffective assistance of counsel during his trial. To succeed, he must prove that (1) his counsel's performance was

---

[24]**United States v. Alix**, 86 F.3d 429 (5th Cir. 1996).

[25]**Id.**

[26]**United States v. Rivas**, 99 F.3d 179 (5th Cir. 1996).

deficient and (2) this deficient performance prejudiced his defense.[27]  We must presume that counsel's performance was reasonable.[28]  Henry Villegas maintains that his attorney failed to file a motion to suppress evidence obtained in a search of his business, Dan's Paint and Body Shop.  He also contends that his counsel failed to impeach an important government witness.

Sufficient evidence existed independently of the things obtained in the search to support Henry Villegas' conviction and a co-defendant's counsel attempted to impeach the government witness with the information of which he now complains.  Even were we to find that counsel's performance was deficient, Villegas' claim would still fail because he was not prejudiced thereby.

We conclude that all other points of error urged by the parties lack merit and they therefore are rejected.

For the foregoing reasons, we AFFIRM the convictions and sentences of Ernest Cortinas, Henry C. Villegas, Daniel Chavez Villegas, Johnny Albert Martinez, and Eric Wayne Green and we VACATE the convictions and sentences of Ricardo Rodriguez and Linda Rodriguez Mata and REMAND for further proceedings with respect thereto consistent herewith.

ENDRECORD

---

[27]**Pitts v. Anderson**, 122 F.3d 275 (5th Cir. 1997).

[28]**Id.**

FITZWATER, District Judge, concurring in part and dissenting in part:

I join the majority opinion except insofar as it vacates the convictions of Linda Rodriguez Mata ("Mata") and Ricardo Rodriguez ("Rodriguez"). Because the majority fails to apply properly the well-settled severance jurisprudence of this circuit, I respectfully dissent from that part of its decision.

I

Mata, Rodriguez, and 25 other defendants were indicted for conspiracy to possess with intent to distribute marihuana, in violation of 21 U.S.C. § 846. The government charged that the conspiracy took place over a period of almost seven years (between June 1, 1985 and May 6, 1992), and that it was broad-ranging in its geographic scope and in the number and respective roles of its participants.

Two of the defendants--Mata and Arturo Villareal, Jr. ("Villareal")--were also indicted for conspiring between April 1, 1987 and July 1, 1993 to launder the proceeds of the marihuana distribution conspiracy, in violation of 18 U.S.C. § 1956(g). Two other defendants were also charged with the substantive offense of possession with intent to distribute marihuana, in violation of 21 U.S.C. § 841(a)(1).[29]

Mata, Rodriguez, and seven other defendants were tried together. The government dismissed one defendant during trial. The jury found seven of the remaining eight defendants--including Mata and Rodriguez--guilty of the

_____

[29]The superseding indictment also charged one defendant with escape. That defendant was a fugitive, and was not tried with the other defendants.

marihuana conspiracy, and acquitted defendant Jesse David Rodriguez ("Jesse"). The jury found Mata guilty of the money laundering conspiracy. It acquitted Johnny Albert Martinez ("Martinez"), the sole defendant who was tried for the substantive offense of possession with intent to distribute marihuana.

The trial evidence showed that Daniel Nieto ("Nieto") commenced in 1984-85 a multimillion dollar smuggling operation in which he used vehicles with hidden compartments to transport large quantities of marihuana from San Antonio, Texas to Saginaw, Michigan. During the 1985-89 period, Nieto obtained marihuana from Villareal, Mata's brother. Mata occasionally arranged for Villareal's marihuana to be delivered to Nieto, who in turn paid Mata several hundred thousand dollars for delivery to Villareal. Mata also engaged in real and personal property transactions for the purpose of laundering the proceeds of the marihuana sales. For several years, Rodriguez, who is Mata and Villareal's uncle, delivered Villareal's marihuana to Nieto's engine and transmission shop in San Antonio. Villareal ceased supplying Nieto with marihuana sometime in 1989. Although the indictment charged that as late as June 10, 1993 Mata committed overt acts in furtherance of the money laundering conspiracy, the evidence against Mata and Rodriguez focused on their activities in Texas during the period that Villareal was Nieto's source of marihuana, which ended in 1989.

In 1989 Nieto met defendant Ernest Cortinas ("Cortinas"). Nieto complained to him that certain of his Michigan customers owed him money. Cortinas, a member of the San Antonio chapter of the Bandido Nation Motorcycle Club,

- 16 -

offered to collect these debts in exchange for a fee. Cortinas was assisted by defendants Eric Wayne Green ("Green") and Edward Salas, and by David Loera ("Loera"), who were also Bandidos.[30]

According to the evidence, the Bandido Nation is an organization involved in motorcycles and crime, principally methamphetamine, stolen motorcycles, prostitution, strong arm, theft, drugs, and violence, including possession of assault weapons and machine guns. The trial evidence showed that the Bandidos engaged in acts of violence as part of their collection efforts. On September 2, 1991 Cortinas, Loera, and Green committed a drive-by shooting of the residence of Forrest Zudell ("Zudell"), a drug debtor who resided in Michigan.[31] The Outlaws, a motorcycle gang headquartered in Detroit, responded by threatening violence against Cortinas because the Zudell family had been under their protection. Nieto was required to provide $25,000 for payment of a tribute to The Outlaws so that they would not use violence against Cortinas. Eventually, the Bandidos took control of Nieto's business.

## II

The oft-cited general rule is that codefendants who are indicted together should be tried together. *See, e.g., Zafiro v. United States,* 506 U.S. 534, 537 (1993); *United States v. Mikolajczyk*, 137 F.3d 237, 240 (5th Cir.

---

[30]Loera joined the Bandidos in 1992.

[31]As the majority opinion notes, a 14-year old boy was killed in the shooting, but the district court precluded the government from disclosing this fact to the jury.

- 17 -

1998).[32]  "The rule that persons indicted together should be tried together carries great weight where, as here, persons are charged with committing the same conspiracy." *Mikolajczyk*, 137 F.3d at 240 (citing *United States v. Archer*, 733 F.2d 354, 360 (5th Cir.1984)); *United States v. Manges*, 110 F.3d 1162, 1174 (5th Cir. 1997), *cert. denied*, __ U.S. __, __ S. Ct. __, 66 U.S.L.W. 3170, 66 U.S.L.W. 3716, and 66 U.S.L.W. 3718 (U.S. May 4, 1998) (No. 97-315); *United States v. Featherson*, 949 F.2d 770, 773 (5th Cir. 1991) ("This rule is especially strong when the defendants are charged with committing the same conspiracy.").  "Joinder is the rule rather than the exception." *Mikolajczyk*, 137 F.3d at 240 (citing *United States v. Chagra*, 754 F.2d 1186, 1188 (5th Cir.1985)).[33]

---

[32]In *Zafiro* the Court held:

> There is a preference in the federal system for joint trials of defendants who are indicted together.  Joint trials "play a vital role in the criminal justice system."  They promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."  For these reasons, we repeatedly have approved of joint trials.

506 U.S. at 537 (citations omitted).  When these informing principles are kept in mind, it is a more facile task to accept the fundamental fairness of joint trials in conspiracy cases, despite differences in the defendants' respective roles and in the nature and quantum of the proof against them.

[33]If joinder were the exception and severance the rule, our courts could become even more clogged by successive trials in which witnesses, jurors, and court officers must present or consider substantially similar, if not identical, evidence concerning the alleged

A district court should grant a severance only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reasonable judgment about guilt. *United States v. Neal*, 27 F.3d 1035, 1045 (5th Cir. 1994) (citing *Zafiro,* 506 U.S. at 539).

A defendant is not entitled to a severance merely because the evidence against a codefendant is more damaging than the evidence against her. *See United States v. Williams*, 809 F.2d 1072, 1085 (5th Cir. 1987). Generally, defendants are to be tried together if their indictments arise out of a common set of circumstances, even if there is a disparity in the quantum of the evidence. *See United States v. Rocha*, 916 F.2d 219, 227-28 (5th Cir. 1990). Moreover, even if there is more damaging evidence presented against one defendant that may spill over to other defendants against whom the evidence is not as damaging, the proper remedy is not severance. *See United States v. Walters*, 87 F.3d 663, 670 (5th Cir.) ("Neither a qualitative disparity in the evidence nor a prejudicial spillover effect is sufficient

conspiracy, augmented in each trial only by evidence by which the government seeks to prove that the defendant on trial was a member of the conspiracy.

in and of itself to warrant a severance.")(citing *United States v. Mitchell*, 31 F.3d 271, 276 (5th Cir. 1994)), *cert. denied*, __ U.S. __, 117 S. Ct. 498 (1996).  The pernicious effect of cumulation is best avoided by precise instructions to the jury on the admissibility and proper uses of the evidence introduced by the government. *See Zafiro,* 506 U.S. at 539 ("When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, . . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice."); *United States v. Piaget*, 915 F.2d 138, 142 (5th Cir. 1990); *United States v. Harrelson*, 754 F.2d 1153, 1175 (5th Cir. 1985).  The district court can properly instruct the jury that it is to consider separately the evidence offered against each defendant.  *See Walters*, 87 F.3d at 670.  If the jury can keep separate the evidence that is relevant to each defendant, even if the task is difficult, and render a fair and impartial verdict as to each defendant, a severance should not be granted.  *See id.* at 670-71.

Where joinder is initially proper, we review the district court's refusal to sever for abuse of

discretion. *Mikolajczyk*, 137 F.3d at 240 (citing *Zafiro*, 506 U.S. at 539); *United States v. Faulkner*, 17 F.3d 745, 758 (5th Cir. 1994). To prevail on appeal, a defendant must show that (1) the denial resulted in compelling prejudice against which the trial court was unable afford protection and (2) the prejudice outweighed the government's interest in economy of judicial administration. *Mikolajczyk*, 137 F.3d at 240-41; *Manges*, 110 F.3d at 1174. The party seeking to establish reversible error has a heavy burden. *See Mitchell*, 31 F.3d at 276; *Neal*, 27 F.3d at 1045.[34]

## III

### A

Mata, in arguments adopted by Rodriguez,[35] contends the district court erred by denying a severance. They

---

[34]In *Mikolajczyk* we noted that the defendants "failed to cite a single case in which this court reversed a conviction for failure to sever." 137 F.3d at 240. Mata and Rodriguez have cited such a case. *See United States v. Fisher,* 106 F.3d 622, 631-32 (5th Cir. 1997) (holding that impeachment of codefendant who had invalid and inadmissible conviction was so prejudicial to defendant that it could not be cured by instruction). *Fisher*, however, is distinguishable and limited to the "extraordinary circumstances of th[at] case." *Id*. at 632 n.10.

[35]As the majority opinion notes, pursuant to Fed. R. App. P. 28(i), Rodriguez expressly adopted by reference the arguments presented in the briefs of the other defendants as those arguments might apply to him. Insofar as Mata's arguments apply to Rodriguez, my reasoning for dissenting from the majority's decision to vacate Mata's conviction applies equally to its decision to vacate Rodriguez's conviction.

maintain that there was a gross disparity in the quantity and venality of the evidence between them and the codefendants, and that there was no testimony or indication that they knew of the Bandidos' violent activities or even of their involvement in a conspiracy with Nieto. Mata also asserts that the district court improperly denied a mid-trial limiting instruction at the time the government offered evidence of the Zudell drive-by shooting, and gave a "marginal and cursory limiting instruction" at the conclusion of trial that was insufficient to protect her rights.

Although the majority opinion recognizes the controlling jurisprudence and standard of review, it proceeds to disregard them, holding in almost summary fashion that Mata and Rodriguez should have been granted a severance. The majority reasons that the government introduced prejudicial evidence concerning Bandidos tactics and activities, including highly inflammatory evidence of the drive-by shooting. Neither Mata nor Rodriguez was associated with the Bandidos, and their involvement with Nieto ended in 1989, before the Bandidos joined the conspiracy. After 1989 Nieto changed

marihuana suppliers and no longer used Villareal. According to the majority, the district court's limiting instructions "were inadequate to mitigate the prejudicial effect of the overwhelming testimony regarding the violent, criminal activities of the Bandidos."

Unlike the majority, I would hold that Mata and Rodriguez have failed to show an abuse of discretion and specific and compelling prejudice.

B

The district court's instructions to the jury, in the context of the facts of this case, were adequate to remedy any prejudice from a joint trial.

The district court gave the jury two pertinent instructions at the conclusion of the case. The first stated:

> No Defendant is on trial for an act, conduct, or offense not alleged in the indictment against the particular Defendant. Neither are you concerned with the guilt of any other person or persons not on trial as a Defendant in this case.

The second instruction provided:

> A separate crime or offense is charged against one or more of the Defendants in each count of the indictment. Each count, and the evidence pertaining to

- 23 -

> it, should be considered separately. Also, the case of each Defendant should be considered separately and individually. The fact that you may find one or more of the accused guilty or not guilty of any of the crimes charged should not control your verdict as to any other crime or any other defendant. You must give separate consideration to the evidence as to each defendant.

We have held in several cases that instructions substantially similar or identical to those given in the present case are sufficient to cure any risk of prejudice. *See, e.g., Mikolajczyk*, 137 F.3d at 242; *Manges*, 110 F.3d at 1175; *United States v. Misher*, 99 F.3d 664, 669 (5th Cir. 1996), *cert. denied*, __ U.S. __, 118 S. Ct. 73 (1997). That the district court did not give the jury cautionary instructions more than one time during the course of trial does not detract from their curative effect, especially when the instructions are considered in conjunction with the other factors discussed below. Moreover, the cases in which we have held that cautionary instructions cured any potential for prejudice have not been limited to those that involved repeated instructions. *See Mikolajczyk*, 137 F.3d at 242 (instructions given at voir dire and trial); *Manges*, 110

F.3d at 1175 (single instruction); *Walters*, 87 F.3d at 670 (appearing to involve single instruction).

C

The verdict in this case also demonstrates that the jury was able to separate the evidence and to consider each defendant and each charge separately.

The jury acquitted Jesse of the marihuana conspiracy and acquitted Martinez of the substantive offense of possession with intent to distribute marihuana. Jesse was not a member of the Bandidos.[36] Martinez was a member of the Southsiders Bikers Club, a "boot camp" for the Bandidos. The jury thus demonstrated its ability to distinguish the Bandidos evidence when addressing the allegations against a non-Bandido, and to accomplish the potentially more difficult task of parsing the evidence against a member of a Bandidos boot camp. These acquittals establish that the jury followed the district court's instructions. *See Walters*, 87 F.3d at 670-71 ("[T]he jury acquitted both [appellants] on several counts of the indictment, suggesting that they heeded the court's instructions."); *Neal*, 27 F.3d at 1045 ("[T]he

---

[36]Nothing in the record reflects that Jesse had any association with the Bandidos.

jury's 'not guilty' verdicts as to some defendants demonstrate that the jurors followed the district court's instructions and considered the evidence separately as to each defendant."); *United States v. Ellender*, 947 F.2d 748, 755 (5th Cir. 1991) ("[A]cquittals as to some defendants on some counts support an inference that the jury sorted through the evidence and considered each defendant and each count separately.").

D

Unlike the majority, I would hold that the temporal and spatial differences between Mata's and Rodriguez's involvement in the conspiracy, and the Bandidos' participation, reduce rather than heighten any concerns that the jury could have erroneously found Mata and Rodriguez guilty based on the Bandidos' violent conduct.

While "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty," *Zafiro*, 506 U.S. at 539, the evidence does not support such concerns in this case. Mata and Rodriguez participated in the conspiracy until 1989, while Villareal was Nieto's marihuana supplier, and their criminal activities took place in Texas. The

Bandidos did not enter the conspiracy until 1989. The violent act that was of principal concern to the defendants--the Zudell drive-by shooting--occurred in Michigan, two years after most of Mata's[37] and Rodriguez's involvement in the conspiracy had ended. The former national secretary-treasurer of the Bandidos testified at trial that Mata was not a Bandido (and, as a woman, could not have been one). The trial evidence did not otherwise connect Mata or Rodriguez to any violent Bandidos acts. In view of the stark contrast between the conduct of Mata and Rodriguez, on the one hand, and the Bandidos, on the other hand, it is doubtful that the jury would have erroneously concluded that Mata and Rodriguez were guilty.

Mata and Rodriguez have failed to demonstrate specific and compelling prejudice based on the Bandidos' conduct. They have not established that this evidence would either have been confusing to the jury or would have prevented it from reaching a fair and impartial verdict. The district court did not abuse its discretion by denying their severance motions.

---

[37]The superseding indictment alleges that on June 10, 1993 Mata committed an overt act in furtherance of the money laundering conspiracy.

Although I respectfully disagree with my colleagues' disposition of Mata's and Rodriguez's convictions, I think it is important to confine the majority opinion to its unusual facts rather than to view it as a well-spring for severance motions in conspiracy cases. The premise of the majority opinion is that the district court abused its discretion because, absent a severance, Mata and Rodriguez were prejudiced by (1) highly inflammatory evidence that would not have been admissible against them had they been tried separately, (2) that pertained to persons with whom they had no connection and to a time-period after they had concluded their charged involvement in the conspiracy, and (3) with regard to which the district court gave inadequate limiting instructions. The Supreme Court teaches that we must evaluate case-by-case the risk of prejudice in a joint trial. *Zafiro*, 506 U.S. at 539. Accordingly, although the majority concludes that Mata and Rodriguez have demonstrated compelling prejudice, today's decision should be limited to the "extraordinary circumstances of this case." *Fisher*, 106 F.3d at 632 n.10.

I concur in part and dissent in part.