In the

# United States Court of Appeals

## For the Seventh Circuit

————————

No. 07-2438

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

VIRGINIA CARTER,

*Defendant-Appellee.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 308—**Harry D. Leinenweber,** *Judge.*

————————

ARGUED APRIL 7, 2008—DECIDED AUGUST 19, 2008

————————

Before RIPPLE, WILLIAMS and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Virginia Carter was convicted by
jury of tax fraud, in violation of 26 U.S.C. § 7206(1), money
laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and
engaging in monetary transactions knowing that the
property involved represents the proceeds of an unlaw-
ful activity, in violation of 18 U.S.C. § 1957. The district
court sentenced her to twenty-four months' imprisonment,

a sentence below the advisory guidelines range.[1] The Government timely appealed the sentence.[2] For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

Robert Carter embezzled money from his insurance business over several years. In 1999 and 2000, his accountant prepared tax returns that reported a total income from those years of less than $300,000. These returns under-reported the Carters' income by nearly $1,700,000. His wife, Virginia Carter, signed those joint tax returns.

In 2002, Ms. Carter filed for a divorce from Robert. Her divorce attorney was unaware that much of the couple's money had been obtained through fraud, and he recommended that she attempt to take control of the couple's liquid assets in order to secure those funds in the pending proceedings. In that year, Ms. Carter transferred more than $3,900,000 into new and previously existing bank accounts bearing only her name.

Ms. Carter was charged with two counts of tax fraud for

---

[1]  The district court had jurisdiction under 18 U.S.C. § 3231.

[2]  We have jurisdiction under 28 U.S.C. § 1291. *See also* 18 U.S.C. § 3742(b).

under-reporting her income in 1999 and 2000.[3] She was also charged with twenty-three counts of money laundering, twenty-two of which went to trial. Eighteen of the money laundering counts that went to trial were based on allegations that, from March 29 to September 18, 2002, Ms. Carter had engaged in monetary transactions to disguise the proceeds of fraud, in violation of 18 U.S.C. § 1956.[4] The other four counts of money laundering were

---

[3] 26 U.S.C. § 7206(1) makes it a felony to "[w]illfully make[] and subscribe[] any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter."

[4] 18 U.S.C. § 1956 states:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)    (i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B)  knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(continued...)

based on allegations that Ms. Carter had engaged in financial transactions with the proceeds of fraud between April 10 and April 29, 2002, in violation of 18 U.S.C. § 1957.[5] Ms. Carter testified at her trial and denied the tax fraud and money laundering allegations. The jury found her guilty on all counts.

At sentencing, the district court heard arguments by Ms. Carter and the Government regarding the presentence investigation report ("PSR") and the calculation of the advisory guidelines range. The court then determined the base offense level for Ms. Carter's offenses to be 29, which included a two-level increase for obstruction of justice. The resulting advisory guidelines sentencing range was 87 to 108 months' imprisonment. After considering the factors set forth in 18 U.S.C. § 3553(a), the district court

_____

[4] (...continued)

> (ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

[5] Under 18 U.S.C. § 1957, it is illegal to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000."

imposed a sentence of 24 months' imprisonment. The district court stated:

> Well, I don't see any legal basis for a departure, so that leaves the issues raised by Section 3553 in determining a sentence that is proper under the facts of the case, and not greater than necessary, to supply the reasons for the penalties in our criminal justice system.
>
> There is no question that the Federal law was broken in this case. A jury so found that Mrs. Carter broke the law on a number of occasions, I think there was something like 30 counts.
>
> As I looked over the counts to which she was found guilty, the tax counts—the first year, 1999, certainly I think that a spouse who is faced with a tax return that is only $40,000 out of whack probably wouldn't notice it. But the next year when they went on the wild spending spree it kind of defies reason that you wouldn't look at the return and say, Wait a minute, there is something wrong here.
>
> I believe that at some point Mrs. Carter must have known her husband was stealing money because their spending went from one level to an entirely different level.
>
> There is no question that when her husband was on his way to prison, or was about to go to prison, she took it upon herself to try and take this money and make it as difficult as possible for anybody, including creditors and the government and the tax people, from collecting it.

So, she violated the law, and the law she violated was structuring and money laundering. Having said that, this is obviously not a paradigm of the money laundering cases.

The article in the sentencing guidelines by the Commission indicates that Congress' original purpose was, in the context of organized crime, to prevent proceeds from crimes from being used to commit other crimes. However, it is still a violation of the law, which she did.

Now, in considering what an appropriate sentence in this case is, it does seem to me that it would be entirely improper to give her a sentence that was similar, or certainly higher, than what her husband got. Her husband was the source of the illegal funds. She did benefit from them though, there is no question about that.

Now, he got, I believe, 71 months, which is certainly in my judgment an appropriate judgment in the fraud conduct in which he engaged in. I think, on the other hand, we do have the age of Mrs. Carter, she is 61, and that is not the age of your normal criminal that comes before the Court for sentencing.

I do think that she probably did freak out when she found out that her husband was basically on his way to prison and had stolen all this money, and I think she acted to a certain extent out of an attempt to protect herself, which I believe, if I remember correctly, I think her divorce lawyer said that he had suggested that that money be put in her name that she was aware of, because I think they were contemplating a divorce.

Now, that is not an unusual recommendation. Having never been a matrimonial lawyer it is my understanding that matrimonial lawyers always tell the wife, If you can do it, get the money in your name and fight about it later in court rather than let your husband take it and you have to fight for it. It is the old, A bird in the hand is worth two in the bush.

So, her actions are not—while certainly not legal, were not wholly not understandable.

I believe also that she probably—I am certain she didn't anticipate the consequences of her actions. She may have known they were illegal, but certainly didn't expect them to be to the extent where she would be standing here possibly subjected to a sentence of 87 months.

I believe she also did not receive good advice. The advice would have been to don't do anything, this money is tainted money. Whatever advice she received, that wasn't it, and she certainly didn't follow it.

There is no indication that she had anything to do with the fraud. It does, however, seem to me that she must have been aware at some point that her husband was doing something illegal because of the vast amount of money that all of a sudden came into his hands, buying a piano, a ring, et cetera.

Her actions were over a relatively short period of time and the Government did recover a good bit of the money.

One of the comforting features of the guidelines was that this type of question didn't come up. It was a

guidelines case, if you don't find a reason for a depar-
ture, you sentence. Now that we have the authority
and the discretion to sentence, we have to make a
conscious decision of what is a fair sentence, and it
is not an easy time.

Having considered everything, it seems to me that
a 24 month sentence is appropriate in this case.

. . . I think this case is a serious one, and I don't think
that a 12 month or a 12 month and a day sentence
is appropriate.

I think under all the circumstances I think that when
one considers the age of—and I don't mean to sug-
gest that she is an old lady, I am considerably older
than she is, but I think it does reflect the seriousness
of the offense, I think it does reflect the characteristics
of the offense, which is not your paradigm instance of
money laundering, and I think it does protect the
public from further crimes from this defendant.

I don't anticipate her breaking the law again, and
I think that certainly a sentence within the guidelines
would have been [disparate] from her husband's
sentence.

Sent. Tr. at 29-33.

## II

## DISCUSSION

We review a sentence for procedural error and substan-
tive reasonableness. *See United States v. Omole*, 523 F.3d

691, 696 (7th Cir. 2008). We therefore begin by ensuring that the district court did not commit any significant procedural error, "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [section] 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 128 S. Ct. 586, 597 (2007); *United States v. Gordon*, 513 F.3d 659, 666 (7th Cir. 2008).

If we determine the district court's sentencing decision to be procedurally sound, we then consider the substantive reasonableness of the sentence. In reviewing the district court's decision on the issue of reasonableness, we employ the deferential abuse of discretion standard. *Gordon*, 513 F.3d at 666; *United States v. Mykytiuk*, 415 F.3d 606, 607 (7th Cir. 2005). Therefore, our "task on reasonableness review is limited." *United States v. Wachowiak*, 496 F.3d 744, 754 (7th Cir. 2007). We must consider the sentencing court's explanation of its reasons for imposing a particular sentence. That explanation need not be exhaustive but it must be adequate "to allow for meaningful appellate review and to promote the perception of fair sentencing." *Omole*, 523 F.3d at 697, 698 (quoting *Gall*, 128 S. Ct. at 597). If the sentence imposed is outside the guidelines range, the district court must provide a justification that explains and supports the magnitude of the variance. *Id.*; *see also Gall*, 128 S. Ct. at 595.

In reviewing the substantive reasonableness of a sentence that falls outside the advisory guidelines range,

we must give due deference to the district court's determination that the section 3553(a) factors, taken as a whole, justified the extent of the variance. *Gall*, 128 S. Ct. at 597; *Gordon*, 513 F.3d at 666. The fact that we "might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall*, 128 S. Ct. at 597. Our review must take into account that a "sentencing judge is in a superior position to find facts and judge their import under [section] 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." *Id.* (quotation omitted). Because the district court has greater familiarity with the case and the individual defendant and therefore an institutional advantage over an appellate court in making sentencing determinations, we must defer, absent an abuse of discretion, to its ruling. *Id.*; *Gordon*, 513 F.3d at 666.

In our consideration of the substantive reasonableness of a sentence, it is important to bear in mind that "[t]he concept of substantive reasonableness contemplates 'a range, not a point.'" *Omole*, 523 F.3d at 698 (citation omitted). "Because the 'contours of substantive reasonableness review are still emerging,' we cannot target a fixed point at which a sentence turns from reasonable to unreasonable, or vice versa." *Id.* (quoting *Wachowiak*, 496 F.3d at 750, 751). "A variant sentence based on factors that are particularized to the individual defendant may be found reasonable, but we are wary of divergent sentences based on characteristics that are common to similarly situated offenders," *id.*, and sentences that "deviate[]

from the guidelines *solely* on the basis of overstated mitigating factors or 'normal incidents' of the offense," *Wachowiak*, 496 F.3d at 754 (emphasis added). Even if a judge overstates mitigating factors or considers "normal incidents" of an offense, however, if such a consideration is "just one of many reasons the judge gave for [his] below-guidelines sentence," the sentence will be affirmed. *See id.*

Here, there is a sizable difference between the advisory range and the sentence imposed on Ms. Carter. The sentencing court therefore was required to enunciate persuasive reasons, based on the factors in section 3553(a), for the variance. *See Gall*, 128 S. Ct. at 596-97; *Omole*, 523 F.3d at 698. The Government contends that seven aspects of the district court's explanation of the variance were either weak or impermissible justifications for mitigation, or were factually incorrect. The Government submits that any justifications properly relied on by the district court were insufficient to support the extent of the variance and that the sentence therefore is substantively unreasonable. We shall consider each of the Government's arguments.

**A.**

The Government's first two contentions relate to the district court's primary explanation for the sentence variance. The district court's stated explanation for the below-guidelines sentence relied primarily on two factors: the district court's finding, based in part on Ms. Carter's age, that she was unlikely to commit future

crimes, and its conclusion that the seriousness and characteristics of her offense were not part of the heartland of money-laundering offenses that the guidelines were designed to address. Sent. Tr. at 32-33. In our view, the Government's objections to the district court's primary justification for the variance are, under the circumstances presented here, without merit.

The Government first submits that Ms. Carter's age was a weak mitigating factor because her age, 61 years, did not set her apart from the usual tax or money-laundering offender.[6] It relies for this proposition on the 2006 Sentencing Commission Report, which found that 47.7 percent of tax offenders were over 50,[7] and that, for persons whose primary offense involved money laundering, 20.4 percent of offenders were over 50.[8] U.S. Sentencing Commission, Sourcebook of Federal Sentencing Statistics, T.6 (2006), *available at* http://www.ussc.gov/ANNRPT/2006/table6.pdf.

Statistical evidence such as that proffered by the Government can no doubt be a helpful tool to a sentencing

---

[6] Ms. Carter's age at the time of sentencing is the relevant comparison because the Sentencing Commission Report, on which the Government relies, uses the offender's age at the time of sentencing. Appendix A to the 2006 Sentencing Commission Report, *Descriptions of Datafiles, Variables, and Footnotes, available at* http://www.ussc.gov/ANNRPT/2006/appendix_A.pdf.

[7] According to the Sentencing Commission Report, the median age of tax offenders in 2006 was 50 years.

[8] According to the Sentencing Commission Report, the median age of money launderers in 2006 was 40 years.

judge. Yet, there is certainly no evidence that Congress
ever intended that such evidence rigidly cabin the dis-
cretion of the district court in exercising its duty under
section 3553(a). In any event, the breadth of the statistical
categories tendered by the Government counsels in
favor of extreme caution in relying on such raw numbers
in the delicate task of sentencing. For instance, the Gov-
ernment notes that, in 2006, almost one-half of tax offend-
ers were over 50 years old. This statistic conveys little
probative information, however, because it does not
provide the age distribution of offenders in the "over 50"
category. Furthermore, it includes all types of tax offenses,
not just the particular tax fraud committed by Ms. Carter,
again without describing the distribution of ages among
those different tax offenses. Nor does the statistic convey
any other relevant measure of the data, like the mean,
median and mode. Because of the caution with which
we approach statistical analysis generally, and because
of the particularly imprecise nature of this statistic in
particular, we cannot conclude on this basis alone that
the district court clearly erred when it found that Ms.
Carter was not a tax offender of the age that "usually"
comes before the courts.[9]

---

[9] We also note that the statistics regarding the age of offenders
whose primary offense category was money laundering might
be a more accurate benchmark than the statistics regarding those
who committed tax fraud. The Report defines a "primary offense
category" as "the offense code applicable to the count of con-
viction with the highest statutory maximum." *See* Appendix A,

(continued...)

The Government additionally submits that Ms. Carter's age was an improper consideration because she is not exceptionally elderly or infirm. It also submits that the district court did not give a sufficient explanation for why Ms. Carter's age was significant. We cannot accept these contentions. The district court's discussion with counsel and its statement of reasons make clear that it considered Ms. Carter's age to be a mitigating factor not because she was infirm, but because her age set her apart from the average offender *and* made it less likely that she would commit these crimes again. *See* Sent Tr. at 30 ("I think, on the other hand, we do have the age of Mrs. Carter, she is 61, and that is not the age of your normal criminal that comes before the Court for sentencing."), 32 ("I think that when one considers the age of—and I don't mean to suggest that [Ms. Carter] is an old lady, . . . but . . . I don't

---

[9]  (...continued)

*available   at*   http://www.ussc.gov/ANNRPT/2006/appendix_ A.pdf. Ms. Carter's primary offense category would be money laundering because it carries the higher statutory maximum term of imprisonment. *Compare* 18 U.S.C. § 1956 (setting a statutory maximum of twenty years' imprisonment for money laundering), *with* 26 U.S.C. § 7206 (setting a statutory maximum of three years' imprisonment for tax fraud). Ms. Carter, whose primary offense category would be money laundering, might be more accurately compared to other offenders whose primary offense also was money laundering than those offenders whose worst offense was the comparatively lesser offense of tax fraud. According to the Government's statistics, for persons whose primary offense involved money laundering, only 20.4 percent of offenders were over 50.

anticipate her breaking the law again."). The likelihood of recidivism is a proper sentencing consideration. 18 U.S.C. § 3553(a)(2)(C) ("The court, in determining the particular sentence to be imposed, shall consider . . . the need for the sentence imposed . . . to protect the public from further crimes of the defendant."). Indeed, we have held specifically that a district court may properly consider a defendant's age as it relates to the possibility of her committing crimes in the future. *See United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming a below-guidelines sentence where the district court's only reason for the variance was that the defendant's age made it unlikely that the defendant again would be involved in another violent crime). We cannot say that the district court abused its discretion when it determined that, based on her age and the totality of the circumstances, Ms. Carter was unlikely to commit further crimes in the future. Consequently, the court did not abuse its discretion when it concluded that this factor counseled in favor of a sentence significantly below an advisory guidelines sentence. *See id.* (affirming a sentence of 200 months' imprisonment, 62 months below the guidelines range, where the variance was based solely on the offender's age); *see also Omole*, 523 F.3d at 698.

The Government's second contention is that the district court erred when it determined that Ms. Carter's offenses were not typical money laundering offenses. The Government relies on the following statement by the district court:

So, [Ms. Carter] violated the law, and the law she violated was structuring and money laundering.

> Having said this, this is obviously not a paradigm of the money laundering cases.
>
> The article in the sentencing guidelines by the Commission indicates that Congress' original purpose was, in the context of organized crime, to prevent proceeds from crimes being used to commit other crimes.

Sent. Tr. at 29-30. The Government also relies on another statement that the court made after it determined and announced Ms. Carter's sentence: "I think under all the circumstances . . . [the sentence] does reflect the seriousness of the offense, I think it does reflect the characteristics of the offense, which is not your paradigm instance of money laundering." *Id.* at 32-33.

The Government submits that there are three types of money laundering: spending, concealment and promotion. Ms. Carter committed two of those types of laundering, specifically spending and concealment. The third type, promotion, refers to money laundering designed to promote an underlying illegal activity, for instance, drug smuggling or racketeering. In the Government's view, the district court's statement reflected an improper assessment that Ms. Carter's spending and concealment were less serious types of money laundering than promotion. The Government's argument is twofold: first, that the district court's statement reflects a finding that concealment and spending are less serious than promotion, and second, that such a finding is improper because Congress intended to punish identically promotion, concealment and spending offenses. The Government

contends that the only proper consideration is "the extent and magnitude of the laundering—not a non-existent distinction between promotion, concealment, and spending." Br. at 27. It contends that Congress intended to punish identically promotion, concealment and spending, as demonstrated by the statutory scheme, which sets the same maximum term of imprisonment for promotion and concealment. *See* 18 U.S.C. 1956.

In stating that Ms. Carter's offense was not the typical case of money laundering, the district court referred to a 1997 report by the Sentencing Commission. *See* Sentencing Policy for Money Laundering Offenses, United States Sentencing Commission (Sept. 18, 1997), *available at* http://www.ussc.gov/r_congress/LAUNDER.PDF. That report states that the "relatively high base offense levels under the money laundering guidelines," *id.* at 4, are "inflexible and arbitrarily determined" without connection "to the seriousness of the defendant's actual offense conduct," *id.* at 9. The Sentencing Commission conducted a multi-year study on money laundering sentences and determined that "money laundering sentences are being imposed for . . . conduct that is substantially less serious than the conduct contemplated when the money laundering guidelines were first formulated." *Id.* at 5. The Commission concluded from its investigation that the sentencing structure was generating disproportionate penalties for violations of federal laws in that serious misconduct was not being punished more severely than less serious offenses and that the structure should be recalibrated to reflect directly the seriousness of the underlying offense. *Id.* at 10. The Commission noted a

particular concern regarding offenses involving the concealment of the proceeds of drug trafficking, the promotion of further criminal conduct, and the use of foreign banks, international transactions or other sophisticated forms of money laundering. *See id.* at 10 & n.22.

Here, the district court's consideration of whether Ms. Carter's offense was a typical money laundering offense was within the bounds of permissible interpretation. A sentencing court is required to consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The district court concluded that Ms. Carter's offense was not in the heartland of offenses that the Sentencing Commission intended to address when it set the guidelines. Its conclusion is supported by the Sentencing Commission's policy statement. The Government's contention that promotional and concealment offenses carry the same maximum term of imprisonment is correct, but unavailing. The district court, in its analysis, did not compare worst-case offenders who simply had undertaken different types of money laundering; instead, it concluded that Ms. Carter's offense, when viewed in light of all the circumstances, was not of the sort that had caused the guidelines to be set at the level at which they had been set. The district court did not abuse its discretion when it selected a sentence that "reflect[ed] the seriousness of" and "provide[d] just punishment for the offense" actually committed by Ms. Carter. *See id.*; *see also United States v. Walters*, 87 F.3d 663, 672 (5th Cir. 1996)

(holding that a sentence reduction was not disproportion-ate in light of the district court's conclusion that the guidelines overstated the seriousness of the offender's actual money-laundering conduct).

## B.

In addition to the Government's first two objections, which relate to the district court's primary explanation of the sentence, the Government makes several other arguments with respect to the district court's general sentencing considerations.

The Government's third contention is that Ms. Carter's reliance on her divorce attorney's advice was not a solid ground for mitigating her sentence because the attorney did not advise her to protect illegally-obtained funds. At sentencing, the district court stated:

> I do think that she probably did freak out when she found out that her husband was basically on his way to prison . . . and I think she acted to a certain extent out of an attempt to protect herself . . . I think her divorce lawyer said that he had suggested that that money be put in her name. . . . So, her actions . . . were not wholly not understandable.

Sent. Tr. at 30-31. The court also said:

> I believe she did not receive good advice. The advice would have been to don't do anything, this money is tainted money. Whatever advice she received, that wasn't it, and she certainly didn't follow it.

Sent. Tr. at 31.

The Government contends that the divorce attorney's advice is not a mitigating factor because the attorney was not fully informed. The divorce attorney testified that he told Ms. Carter on March 28, 2002, "to make certain that you preserve the liquidity for as long as you can because I don't want the spouse to in any way try to take the moneys and freeze her out or starve her out." Tr. at 683, 689; *see also id.* at 690 ("Q. So you told her to protect [the liquid] assets, right? A. Yes."). He also testified that Ms. Carter did not tell him that some of the couple's liquid assets were the proceeds of Robert's fraud. *Id.* at 690 ("[I]t never came up about any type of fraud whatsoever."). The attorney further stated that he would not have advised her to transfer funds that were the proceeds of fraud. *Id.* at 690-91.

The Government contends that the "district court did not consider that [Ms. Carter's] divorce attorney testified that, if [she] had told him about the source of the money, he never would have suggested that she 'protect' (notably different from 'conceal') her assets." Appellant's Br. at 28. The district court stated that her actions "were not wholly not understandable," Tr. at 31, based in part on the conversations that Ms. Carter had with her attorney. Nothing in the record suggests that the court misconstrued her attorney's testimony or his advice to her. Nor does the record suggest that the district court put undue weight on this consideration.[10] The district court acted

---

[10] The district court stated: "I believe she did not receive good advice. The advice would have been to don't do anything, this

(continued...)

within the permissible bounds of discretion in considering evidence of the effect the advice had on Ms. Carter as a factor affecting "the nature and circumstances of the offense" she committed. *See* 18 U.S.C. § 3553(a)(1).

The Government's fourth contention is that the district court's comparison of Ms. Carter's sentence with her husband's sentence was impermissible because Ms. Carter was not similarly situated to her husband. Here, it presumably relies on the following statement by the district court:

> Now, in considering what an appropriate sentence in this case is, it does seem to me that it would be entirely improper to give her a sentence that was similar, or certainly higher, than what her husband got. Her husband was the source of the illegal funds. She did benefit from them though, there is no question about that.

Sent. Tr. at 30. After announcing Ms. Carter's sentence, the district court also stated: "I don't anticipate her breaking the law again, and I think that certainly a sentencing within the guidelines would have been [disparate] from her husband's sentence." *Id.* at 33.

The Government contends that Ms. Carter is not similarly situated to her husband because, unlike him, she did not plead guilty but instead went to trial. It also

---

[10] (...continued)

money is tainted money. Whatever advice she received, that wasn't it, and she certainly didn't follow it." Sent. Tr. at 31.

contends that, unlike her husband who pleaded guilty, Ms. Carter lied on the stand and received a two-point enhancement for obstruction of justice. At trial, however, the Government agreed that Robert's offenses were much worse than Ms. Carter's offenses. Tr. at 1042 ("I am not even here to tell [you that] she is wor[s]e t[h]an Robert Carter. In fact she is not. Robert Carter is much worse than she is.").

The district court's consideration of this factor was proper. *See Gall*, 128 S. Ct. at 600 (holding that a sentencing court may properly consider "the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated"). Additionally, the court did not put unreasonable weight on the comparative sentences of the two; the court did not base the extent of the variance from the guidelines solely on the differences between Ms. Carter and Robert. *See Wachowiak*, 496 F.3d at 748. Nor was it unaware that some aspects of Ms. Carter's circumstances and offenses were different from—and possibly worse than—Robert's situation; the court knew that, in contrast with Robert, Ms. Carter had not accepted a plea agreement and had been found guilty by a jury. In sum, the court reasonably compared Ms. Carter's conduct and circumstances to Robert's conduct and circumstances. *Compare Gall*, 128 S. Ct. at 600 ("[I]t is perfectly clear that the District Judge considered . . . the need to avoid unwarranted *similarities* among other [defendants] who were not similarly situated."). We cannot say that its consideration of this factor was erroneous.

The Government's fourth objection relates to the district court's statement that Ms. Carter "freaked out when she found out that her husband was basically on his way to prison," and that her "actions were over a relatively short period of time." Sent. Tr. at 30, 32. The Government contends that this conclusion was factually erroneous because Ms. Carter committed tax fraud on her 1999 and 2000 returns, although her concealment money laundering occurred primarily over the forty days between March 29 and May 7, 2002.[11] Tr. at 577, 594-602. It submits that this factor was, at most, a very weak mitigating factor.

We first note that the Government itself emphasized the short time frame in which Ms. Carter's money laundering occurred. Tr. at 1010 ("This chart and the indictment summarize 24 transactions in 60 days. If you take out the September transaction, it is just 30 days."). A fair reading of the district court's remarks would assume that its consideration of this factor was limited to the money laundering offenses which, as we have noted earlier, were most operative in setting the offense level. The criminal activity of which Ms. Carter was convicted did involve fraudulent tax activity in 1999 and 2000, in addition to her money laundering offenses in 2002. It is doubtful, however, that the court would have considered this factor to be a substantial one in determining the

---

[11] One transaction occurred outside that time frame, on September 18, 2002, and involved a wire transfer of funds from an account in Ms. Carter's name to one held jointly by her and her husband.

sentence for those offenses. To the extent that the district court erred when it concluded that Ms. Carter's tax fraud offenses, as opposed to the money laundering offenses, occurred over a relatively short period of time, the other reasons offered by the district court for the sentence imposed assure us that this error does not alone render the district court's conclusion unreasonable. *See Wachowiak*, 496 F.3d at 754 (holding that even if a judge overstates mitigating factors or considers "normal incidents" of an offense, if the consideration is "just one of many reasons the judge gave for [his] below-guidelines sentence," the sentence will be affirmed); *see also United States v. Cherry*, 487 F.3d 366, 372 (6th Cir. 2007) (holding that a "large downward variance" was not unreasonable "in light of the other reasons offered by the district court for the sentence imposed," even where the court erroneously concluded that the defendant's crimes had occurred in a short period of time).

The Government's fifth contention is that the district court impermissibly considered Ms. Carter's expectation that she would not get a lengthy sentence. It points to a statement by the district court at sentencing:

> I believe also that she probably—I am certain she didn't anticipate the consequences of her actions. She may have known they were illegal, but certainly didn't expect them to be the extent where she would be standing here possibly subjected to a sentence of 87 months.

Sent. Tr. at 31. The Government contends that this consideration defies one goal of section 3553(a)—promoting respect for the law.

The Government's argument puts more weight on this comment than it ought to have to bear. The statement was made during the court's discussion of Ms. Carter's decision to ensure that the funds from the marriage be in her name rather than her husband's. In context, the district court was expressing its belief that, although she knew that such unilateral action with respect to tainted funds was illegal, she did not appreciate the seriousness of the offense. Tr. at 32.

Finally, the Government contends that the district court erred because its reasons for the reduced sentence did not apply to the tax fraud convictions, which alone merited a longer sentence than Ms. Carter received. In this respect, the Government relies on its contention that Ms. Carter's age was standard for tax offenders. As we have stated earlier, this contention is without merit. Moreover, the district court's determination that Ms. Carter was unlikely to commit these crimes again applies to the tax fraud convictions; consequently, we cannot expect that the district court would have imposed a high sentence even if these crimes had been the only ones charged. The court stated that the sentence was sufficient to "protect the public from further crimes from this defendant," and that the court did not "anticipate her breaking the law again." Sent. Tr. at 32-33. These factors were properly considered by the district court and reflect the district court's serious consideration of section 3553(a), including its stated purpose of "impos[ing] a sentence sufficient, but not greater than necessary . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the of-

fense." 18 U.S.C. § 3553(a)(2)(A). Furthermore, the Government's arguments fail to take account of the fact that Ms. Carter was sentenced to 36 months' supervised release in addition to her sentence of 24 months' imprisonment. Notably, the Supreme Court recently held that a term of supervised release involves a "substantial restriction of freedom." *Gall*, 128 S. Ct. at 595 (quotation omitted).

## C.

In sum, the sentencing judge's articulated reasons for the variance from the advisory guidelines range assure us that the sentencing process was a reasoned one. *See Omole*, 523 F.3d at 698. The court's justifications are sufficient to explain the extent of the variance from the advisory guidelines range. The Government's arguments that the sentence is unreasonable give too little effect to the congressional command that a sentencing court impose a sentence "sufficient, but not greater than necessary," to comply with section 3553(a)(2). The issue here is whether, as it pertains to this defendant and the offenses she committed, the sentence comports with the purposes of section 3553(a)(2)(A). In imposing the 24-month sentence, the district court stressed repeatedly the seriousness of Ms. Carter's offense and considered her as an individual entitled to an individualized sentence. *See Wachowiak*, 496 F.3d at 748, 754. It concluded that Ms. Carter's individual characteristics warranted a sentence significantly below the advisory guidelines range. We cannot say that the court abused its discretion when it concluded that this sentence reasonably reflects

the seriousness of the offense, promotes respect for the law and provides just punishment for the offense. *See id.*; 18 U.S.C. § 3553(a)(2)(A). The record makes clear that the district court did not select the sentence arbitrarily, base the sentence on impermissible factors, fail to consider pertinent section 3553(a) factors or give an unreasonable amount of weight to any pertinent factor. Its explanation for its sentence was sufficient to allow for meaningful appellate review and to promote the perception of fair sentencing and its reasoning adequately justified the extent of the variance from the advisory guidelines range. *See Omole*, 523 F.3d at 697; *see also Gall*, 128 S. Ct. at 597. We might have adhered to the guidelines or imposed a somewhat harsher sentence had we been sitting as district judges. *See Gall*, 128 S. Ct. at 597. Our review is not de novo, however. Our authority is simply to determine if the sentence is legal and, in the circumstances of the case, reasonable in light of the statutory mandate contained in 18 U.S.C. § 3553(a). Given those limitations on our authority, the sentence of the district court must stand.

## Conclusion

Accordingly, for the reasons set forth in this opinion, we affirm the judgment of the district court.

AFFIRMED