In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-2520

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GARI ALDRIDGE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 767-1—**James B. Zagel**, *Judge.*

ARGUED SEPTEMBER 17, 2010—DECIDED APRIL 22, 2011

Before POSNER, KANNE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Gari Aldridge appeals his convictions for wire fraud and aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. He offers several reasons why we should rule in his favor: key evidence, he contends, should have been suppressed because it was procured through a warrantless search; even apart from this, he urges that there was insufficient evidence to sustain his convictions; and finally,

he complains that his sentence was unreasonably long. We find no error, however, that requires correction, and we thus affirm the district court's judgment.

**I**

Aldridge's crimes involved financial misfeasance. Along with his brother Tracy Aldridge ("Tracy"), his wife Ilona Rivera, and James Casmay, he incorporated Century Financial, Inc. ("CFI"); all four organizers then served as CFI's directors. CFI held itself out as providing financial planning, investment, and mortgage brokerage services, particularly for customers with sub-prime credit histories. It raised its initial capital by selling purported certificates of deposit in 2002 and 2003 to investors in the Chicago area. The problem, however, was that contrary to CFI's representations that the CDs were fully insured by the FDIC and would provide a return of 6% interest quarterly, none of that was true. Instead, they were nothing but a mechanism to enrich Aldridge and his group. The proceeds from the sales, totaling approximately $1.7 million, were transferred from an Illinois bank to the Aldridges' personal bank accounts in Florida. Aldridge then spent much of the money on personal expenses, including high-flying vacations and luxurious shopping trips.

In 2003, Rivera resigned as CFI's corporate secretary. Several years later, in early May 2006, a lawyer from the Securities and Exchange Commission ("SEC") deposed her as part of an investigation of CFI. Shortly after her

deposition, Rivera called the SEC lawyer to inform him that she suspected Aldridge of insurance fraud. She revealed that she had been collecting documents about CFI since the summer of 2004. At the SEC's request, she turned the documents over to the agency.

Government agents told Rivera to let them know if she found any other suspicious materials. Rivera did so, sending two more batches of materials to the SEC in July 2006 and November 2006. She took some of these materials from a black plastic box that Aldridge had given to her with the comment, "[T]hese are the CDs and you need to destroy them." Rivera testified that she disregarded Aldridge's instructions and instead sent the documents to the government because she wanted to exonerate her son, she feared Aldridge, and she thought it was the "right thing" to do.

The government soon indicted Aldridge on six counts of wire fraud and aiding and abetting wire fraud. Before trial, Aldridge was released on bond and allowed to attend a seminar in Hawaii. In an affidavit submitted to the court, Aldridge stated that he planned to travel to Hawaii as a "prospective employee" of the "Seoul Christian Assembly" to discuss serving "as a liaison in California for a project to assist Korean immigrants with cultural assimilation." That story, too, was hogwash. In a video of his meeting, Aldridge was shown making a familiar pitch to potential investors in Hawaii. The district court understandably revoked his bond.

At trial, Casmay and Tracy testified that it was Aldridge who formed the plan to sell the supposedly risk-free,

FDIC-insured investment product. They further testified that Aldridge directed Tracy to use the victims' monies for Aldridge's personal expenses. One victim testified that Aldridge made multiple excuses, such as computer error and a mistake in the account from which the checks were drawn, for not making timely payments to him. Tracy also testified that CFI had given out only three or four mortgage loans.

A jury convicted Aldridge on all counts, and the court then ordered a presentence report ("PSR"). In that report, the probation officer calculated his offense level at 33. Turning to criminal history, the probation officer concluded that Aldridge had accumulated four points, stemming from prior convictions for theft, bigamy, and patronizing prostitution. This placed him in Criminal History Category III. Based on those calculations, the PSR recommended a guidelines range of 168-210 months. At sentencing, the district court took the position that, although the probation officer's calculations were "technically" correct, they reflected an analysis that overstated both Aldridge's degree of culpability and his criminal history. The district court reasoned that a more appropriate sentencing calculation would be based on an offense level of 29 and two criminal history points (Category II), thereby producing a recommended guidelines range of 97-121 months. The district court acknowledged, however, that Aldridge's behavior in Hawaii was disturbing. In the end, the court sentenced Aldridge to 144 months.

## II

As we noted, Aldridge raises three issues on appeal. We begin with his argument that the evidence that Rivera turned over to the government should have been suppressed. Aldridge's primary point is that Rivera was acting as an agent of the government when she located and turned over the incriminating documents. If she was, then this was a warrantless search, and we would need to consider whether the evidence that was produced should have been suppressed. If Rivera was acting on her own, however, then the analysis is different. Until now, we have not definitively resolved what standard of review should apply when we consider a ruling that a person acted as a private individual when conducting a search. See *United States v. Ginglen*, 467 F.3d 1071, 1074 (7th Cir. 2006). But even under the most favorable standard we can offer, *de novo* review, Aldridge cannot succeed.

As we interpret his brief, Aldridge is making two distinct arguments in support of suppression. First, he urges that Rivera was acting as a government agent and in that capacity she engaged in a warrantless search and seizure. Second, he suggests that even if Rivera was acting privately, she had no authority to consent to the government's search of the materials she handed over. Without valid consent, the government needed—and did not have—a warrant to support its search.

The Fourth Amendment generally does not apply to searches and seizures by private parties, but it does apply if the private party is acting as a government

agent. *United States v. Hall*, 142 F.3d 988, 993 (7th Cir. 1998). The defendant bears the burden of proving agency, based on all the circumstances. *United States v. Shahid*, 117 F.3d 322, 325 (7th Cir. 1997). In *Shahid,* we identified two lines of inquiry that assist in this analysis: "whether the government knew of and acquiesced in the intrusive conduct and whether the private party's purpose in conducting the search was to assist law enforcement agents or to further [her] own ends." *Id.* Looking at the matter more generally, we see that the Restatement (Third) of Agency defines agency as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006). Both sides must agree, in other words, to the creation of the agency relationship. This is why, in *Shahid*, we also considered the question whether the private actor acted at the request of the government and whether the government offered the private actor a reward. *Id*. Although ratification after the fact of an action taken by another is possible, see RESTATEMENT (THIRD) OF AGENCY § 4.01, something more than approval is needed. A person ratifies an act by "manifesting assent that the act shall affect the person's legal relations" or by "conduct that justifies a reasonable assumption that the [principal] so consents." *Id.*

The facts of this case point decisively away from a finding of agency. Nothing suggests that the government made Rivera its agent before she started collecting

the incriminating materials. Indeed, the government had no idea that she was doing so. The SEC agents told her to keep a lookout for suspicious materials and if she found something, to secure it and let them know. There is no indication that the agents realized that she had already done anything. Because Rivera was married to Aldridge, they may have assumed that she had joint control with her husband over his records. Finally, there is no evidence here of ratification: the government simply took what Rivera unilaterally offered.

Rivera had a number of reasons why it was in her personal interest to help the government investigate CFI. She wanted to exonerate her son; she was afraid of her husband; and it is a fair inference that she wanted to exonerate herself. She said that she thought that assisting the government's inspection was the right thing to do. None of this points to a finding that she was acting as a government agent. As this court has stated before:

> The social policies pursued by the government will often coincide with the social ideals of many private persons; the coincidence of these goals falls short of establishing that the private persons are controlled by the government. Quite the contrary, it is a reflection of our democratic system in proper working order, the government acting as agent of the people. Private parties may, of their own accord, pursue the same objectives they have set for their elected officials without acquiring the legal status of governmental agent.

*United States v. Koenig*, 856 F.2d 843, 850 (7th Cir. 1988).

None of the other considerations mentioned in *Shahid* lends support to Aldridge's contention either. The government was not directing Rivera. The agents suggested that Rivera keep her eyes peeled and send them any suspicious materials she might find, but they offered her no reward for her cooperation. It was Rivera who initiated the cooperation; the government's involvement began only after it started receiving materials from her. In light of all of this, we are confident that Rivera acted as a private citizen pursuing her own interests when she decided to help the government prosecute her husband for his misdeeds. The Fourth Amendment was therefore not implicated in her searches of the records that she and her husband had retained, and there was no reason to suppress this material.

Aldridge's second argument assumes that Rivera was a private actor. Even so, he says, because she was not authorized to consent to the government's *de facto* search and seizure of the materials, this should still be regarded as an impermissible warrantless search. In so arguing, he implicitly concedes that the Fourth Amendment's warrant requirement is subject to exceptions, including as relevant here an exception when government agents obtain consent for a search. *United States v. Matlock*, 415 U.S. 164, 170-71 (1974) (recognizing that no warrant is required when a defendant or an authorized third party consents to a search or seizure). Aldridge argues that under the rule of *United States v. Basinski*, 226 F.3d 829 (7th Cir. 2000), Rivera had no authority to hand over materials to the government and consent to their search. As there was no valid consent, he says, the

search violated the Fourth Amendment. For this part of the case, both parties focus on the materials taken from the black box that Aldridge gave to Rivera, and so we follow suit.

The first problem with Aldridge's argument is that it fails to grapple with the Supreme Court's holding in *United States v. Payner*, 447 U.S. 727 (1980). In *Payner*, the Court held that a federal court is not required "to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court." *Id.* at 735. Read broadly, this would suggest that it makes no difference whether Rivera herself obtained the documents lawfully or by theft: as long as the government was faultless, it may use them in its case. There is, we acknowledge, a factual distinction between Aldridge's case and *Payner*: in Aldridge's case, the theft was from Aldridge himself, not a third party. We have no need here to decide whether that is enough to take him outside *Payner*'s rule, because even if Rivera's right to take the documents mattered, Aldridge cannot prevail.

*Basinski* concerned a defendant charged with stealing jewels; he gave his best friend a locked briefcase, without informing the friend of the contents of the case, and told him to destroy it. 226 F.3d at 832. The friend gave the briefcase to FBI agents, who—without a warrant—then broke it open. *Id.* at 832-33. The search revealed documents containing names of wholesale jewelers and combinations for locks belonging to the jewelers. *Id.* at 833. The defendant moved to suppress

the contents of the briefcase. *Id.* The government argued, among other things, that it had the friend's consent to search the briefcase and so no warrant was required. *Id.* at 834. We rejected this argument, finding on those facts that the friend had neither actual nor apparent authority to consent to the search. *Id.* In particular, the briefcase was locked, the friend was not informed of the contents of the case, and the friend had no possessory interest in either the case or its contents. *Id.* at 835. As there was no valid consent, we held that the government's warrantless search violated the Fourth Amendment and suppression of the evidence was necessary. *Id.* at 838-39.

There are critical differences between *Basinski* and Aldridge's case. The black box that Aldridge gave to Rivera was not locked, and Aldridge told Rivera what was in the box—the CDs pertaining to CFI's dealings. Furthermore, Rivera was no stranger or casual friend; she was a former employee of CFI and Aldridge's wife. As *Matlock* instructs, "[Common] authority . . . rests [] on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the [joint users] has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the [effects] to be searched." 415 U.S. at 172 n.7. When Aldridge transferred the box to his wife, there is nothing to refute the conclusion that he had conferred joint custody over the box and its contents. This in turn means that Rivera had authority to hand over the materials and consent to their search

and seizure. *Id.* at 171. The fact that Rivera was CFI's corporate secretary and Aldridge's wife reinforces that conclusion. *Basinski*, 226 F.3d at 834 ("Under the apparent authority type of third-party consent, the government must show that a reasonable person, with the same knowledge of the situation as that possessed by the government agent to whom consent was given, would reasonably believe that the third party had authority over [the material] searched [or seized]."). Because Rivera had authority to consent, and did consent, to the government's acquisition of the materials, the government required no warrant for its search.

We note, for completeness, that this conclusion supports our rejection of Aldridge's argument that Rivera acted as a government agent. Even if Rivera was acting as a government agent, this would not automatically direct suppression; it would simply trigger a Fourth Amendment analysis. In conducting that analysis, we would need to ask whether the government's warrantless searches and seizures fit within an exception to the warrant requirement. Since Rivera had authority to consent to a search or seizure of the materials and did so consent, the government's searches and seizures fall within the consent exception to the warrant requirement. *Matlock*, 415 U.S. at 171. Thus, there is no violation of the Fourth Amendment.

Aldridge's remaining argument with respect to his conviction deals with the sufficiency of the evidence. We review *de novo* the district court's denial of a motion for acquittal under Federal Rule of Criminal Procedure 29.

*United States v. Hach*, 162 F.3d 937, 942 (7th Cir. 1998).
When reviewing a sufficiency claim, the court "consider[s] the evidence in light most favorable to the government, drawing all reasonable inferences in its favor."
*United States v. Frazier*, 213 F.3d 409, 416 (7th Cir. 2000).
As long as a rational trier of fact could have returned a guilty verdict, the verdict will be affirmed. *United States v. Pribble*, 127 F.3d 583, 590 (7th Cir. 1997).

There was more than enough evidence in this record for a reasonable jury to find that Aldridge intended to defraud his victims. Casmay's and Tracy's testimony established that Aldridge formed and directed CFI's scheme. The jury was not required to believe Aldridge's weak excuses for CFI's inability to pay and CFI's lack of home mortgage business; it could instead have inferred that CFI and Aldridge were trying to defraud their "investors."

Last, we consider Aldridge's assertion that his sentence was unreasonable. We review a district court's sentencing decision solely for abuse of discretion. *United States v. Carter*, 538 F.3d 784, 789 (7th Cir. 2008); *Rita v. United States*, 551 U.S. 338, 351 (2007). We "will uphold an above-guidelines sentence so long as the district court offered an adequate statement of its reasons, consistent with 18 U.S.C. § 3553(a), for imposing such a sentence." *United States v. McIntyre*, 531 F.3d 481, 483 (7th Cir. 2008). There is no presumption that a sentence outside the guidelines' range is unreasonable. *Gall v. United States*, 552 U.S. 38, 51 (2007).

Aldridge chiefly argues that the district court erred because it enhanced the sentence beyond the guideline range that the court ultimately used, based only on "the normal incidents of the offense"—namely, financial harm to the victims and the character trait of dishonesty. These points, he says, were already taken into account by the guidelines. See *Carter*, 538 F.3d at 790. But *Carter* further observes that "[e]ven if a judge . . . considers 'normal incidents' of an offense, [] if such a consideration is 'just one of many reasons the judge gave for [his] below-guidelines sentence,' the sentence will be affirmed." *Id.* (internal citations omitted). Here the district court indicated that part of the reason it lengthened the sentence was because of Aldridge's conduct in Hawaii. His financial presentation there was a strong sign that he was starting down the path to future fraud. This is not a normal incident of the offense for which he was convicted. The district court reasonably determined that the sentence had to be increased to deter Aldridge from re-offending.

There is a different problem with the district court's approach, however, that we must mention. The district court acknowledged that the probation officer had correctly identified both the offense level and the criminal history category applicable to Aldridge's advisory guidelines range. What the court should have done at that point was not to re-jigger the advisory guidelines range, but instead to have gone on to apply the § 3553(a) factors to determine the appropriate sentence for Aldridge. *Gall*, 552 U.S. at 49-50. In the course of its consideration of the § 3553(a) factors, the court could have discussed any

reasons why it thought that Aldridge's degree of culpability and criminal history dictated a sentence outside the guidelines range. See 18 U.S.C. § 3553(a)(1) (directing district courts in sentencing to consider "the nature and circumstances of the offense and the history and characteristics of the defendant"). The court here committed a procedural error when it attempted to "correct" a presentencing report that it acknowledged had "technically" come to the right offense level and criminal history category. Our review of the court's explanation for its sentence, however, convinces us that this error was harmless. *United States v. Anderson*, 517 F.3d 953, 965 (7th Cir. 2008) (applying harmless-error analysis to sentencing).

* * *

We therefore AFFIRM the judgment of the district court.