**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 07-4181

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

      v.

WALTER ROBERT HAWES,

             Defendant - Appellant.

Appeal from the United States District Court for the District of South Carolina, at Charleston.  Patrick Michael Duffy, District Judge.  (2:05-cr-00267-PMD)

Argued:  October 31, 2008          Decided:  January 30, 2009

Before WILKINSON and GREGORY, Circuit Judges, and Martin K. REIDINGER, United States District Judge for the Western District of North Carolina, sitting by designation.

Affirmed by unpublished opinion.  Judge Reidinger wrote the opinion, in which Judge Wilkinson and Judge Gregory joined.

**ARGUED:** John Robert Haley, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, South Carolina, for Appellant.  Michael Rhett DeHart, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee.  **ON BRIEF:** Reginald I. Lloyd, United States Attorney, Columbia, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

REIDINGER, District Judge:

After pleading guilty to the charge of identity fraud in violation of 18 U.S.C.A. § 1028(a)(7) and (b)(1)(D) (West 2000 & Supp. 2008), the Defendant Walter Robert Hawes was sentenced to 120 months' imprisonment.  Hawes appeals, arguing that his sentence is substantively unreasonable.  Finding no abuse of discretion by the district court, we affirm.

I.

In 1995, Hawes was one of four roommates sharing a house in Charleston, South Carolina.  After he abruptly moved out, it was discovered that Hawes had stolen the Social Security card, birth certificate, and personal checks of one of his roommates, Robert Burke, and had cashed those checks, receiving approximately $2,000.00.  It was also discovered that Hawes had stolen personal checks from another roommate, Gary Elliot, and had cashed those checks, receiving approximately $1,800.00.

After stealing the personal checks of his roommates, Hawes fled to North Carolina, where he obtained a driver's license in Burke's name using the stolen birth certificate and Social Security card.  While in North Carolina, Hawes incurred unpaid medical bills, credit card debt, telephone bills, and cable bills in Burke's name.  Using Burke's identity, Hawes married a woman in North Carolina, fathered a child, and incurred child

2

support obligations. Hawes subsequently abandoned this family and moved back to South Carolina, where he fathered another child, still using Burke's identity. When Hawes defaulted on his child support obligations in North Carolina, there was an attempt to garnish Burke's wages for the child support obligations incurred by Hawes using Burke's identity.

Hawes used Burke's identity for more than a decade, and in the process, destroyed Burke's credit record. At the sentencing hearing, Burke testified that he could never clean up his credit report because once he corrected it, "new things would pop up all the time. So it was a never-ending nightmare." J.A. 45.

Burke and his wife suffered substantial inconvenience and stress related to repairing his damaged credit record. Burke testified that collection agencies have been calling him for over a decade for unpaid bills that Hawes incurred in his name. Burke testified that for several years, these calls occurred on a daily basis. Burke stated that collection agencies "aren't kind people" and that they did not believe him when he told them that he was a victim of identity theft. J.A. 45-46. As a result, he testified, "it was impossible to stop that nightmare from happening. It was an incessant, over and over, daily matter that happened for a decade." J.A. 46.

Burke testified that due to his ruined credit history, he had to pay 22 percent interest for an automobile loan, far

3

higher than he should have paid given his actual credit history. He further testified that he had to pay higher interest for credit cards and that he could not be the primary borrower on his home mortgage. Burke's credit history was so damaged that he was forced to obtain a new Social Security number from the Social Security Administration.

Using Burke's identity, Hawes was convicted of at least three felonies and was incarcerated in state prison. Burke testified that he was once denied a job because of the criminal record that Hawes had compiled in his name. Burke further testified that he lost a job opportunity at another company which paid $20,000 more per year than his position at the time because the company's background check revealed the crimes that Hawes had committed using Burke's identity. Burke testified that this criminal record had "a chilling effect on my career over the past ten years because I'm afraid to leave jobs." J.A. 50. Burke testified that he was forced to travel to Raleigh to get fingerprinted, and state authorities had to compare his fingerprints to the fingerprints on every arrest record that Hawes had compiled in his name. Despite Burke's efforts, his current job at Bank of America was delayed for more than one month because of this erroneous criminal record.

In November 2004, the Secret Service located Hawes in Ladson, South Carolina. Hawes initially identified himself to

4

the Secret Service as Robert Burke, and he provided Burke's Social Security card and birth certificate as proof of his identity. Ultimately, Hawes confessed to stealing Burke's identity. He explained that he had assumed Burke's identity because he previously had testified for the state in an attempted murder trial and he was scared. At the conclusion of the interview, the agents advised Hawes that he would be indicted and that he would receive a summons to appear for arraignment.

Following his indictment in March 2005, Hawes absconded. While a fugitive, Hawes continued to use Burke's identity, incurring over $4,000 in unpaid medical bills in Burke's name. Hawes committed additional identity theft by stealing the Social Security card and birth certificate of his employer's son, Eric Beltz. Using this stolen information, Hawes obtained a Georgia driver's license and incurred more than $5,000 in credit card debt in Beltz's name.

In July 2006, Hawes was arrested by state authorities for the theft of Beltz's identity. At the time of his arrest, Hawes was living in Summerville, South Carolina, with his common law spouse, Angel Sollars. A search of the residence revealed numerous items procured through fraud, including air conditioners, clothing, jewelry, tools, and electronic appliances. In an interview with the Secret Service following

5

his arrest, Hawes stated that he knew he was wanted by law enforcement, but he fled because he was afraid of going to jail. During this interview, agents described the harm that his identity theft had caused Burke. Hawes responded that Burke "didn't have a very good life to begin with." J.A. 62.

## II.

On September 13, 2006, Hawes entered his plea of guilty to the indictment. A Presentence Report (PSR) was prepared, and based upon a criminal history category of V and an offense level of 12, the appropriate advisory Guidelines range was calculated to be 27 to 33 months' imprisonment. In the PSR, the probation officer recommended an upward departure from the Guidelines or an upward variance under 18 U.S.C.A. § 3553(a) (West 2000 & Supp. 2008). Hawes did not file objections to any portion of the PSR.

Arguing that Hawes' acts of identity theft caused substantial harm and inconvenience to his victim, the government moved for an upward departure based upon Application Note 19 of U.S.S.G. § 2B1.1 (2005). The government also moved for an upward variance, arguing that the factors set forth in 18 U.S.C. § 3553(a) merited a sentence greater than the Guidelines range.

At the sentencing hearing, the district court heard testimony from two of Hawes' victims, Robert Burke and Eric

6

Beltz, as well as Secret Service Agent Phil Carter. During his testimony, Burke provided the district court with a detailed list of all unpaid credit accounts obtained by Hawes that have appeared on Burke's credit reports, as well as a calculation of the additional interest Burke has had to pay as a result of his poor credit rating resulting from the identity theft. Burke estimated that these unpaid bills and additional interest payments amounted to $18,541.00, although he noted that this figure did not include the cost he had incurred in investigating the identity theft. Burke estimated that he has spent "thousands of hours" trying to repair his credit record. J.A. 46.

Beltz testified that his parents had employed Hawes to perform work on several rental houses. He testified that Hawes had gained his parents' trust over the years, and that they had provided Hawes and his girlfriend financial assistance and had showered them with gifts. Beltz testified that Hawes stole his identity for approximately two months and incurred approximately $8,000 in credit card debt. Beltz testified that because his Social Security card is still missing, he has to "keep constant check on my credit report. And it's just been a pain. A big pain." J.A. 68.

At the sentencing hearing, the district court notified Hawes that it was "strongly considering" an upward departure

and/or variance, and the court continued the hearing to allow the parties time to brief the issue. J.A. 38. Following the submission of briefs by both parties, the district court held a second sentencing hearing. After hearing arguments from counsel, the district court announced that it found the government's motion for an upward departure to be "clearly warranted" pursuant to Application Note 19 of U.S.S.G. § 2B1.1. J.A. 94. Specifically, the district court found that Hawes had caused substantial harm and inconvenience to Burke:

> To say that the victim in this case suffered substantial inconvenience is so understated, it would almost be laughable. Inconvenience doesn't begin to describe what . . . the victim suffered at the hands of this defendant. Not only was his reputation and credit not repaired, they were destroyed, so much so that the victim, Mr. Burke, after years and hours of harassing telephone calls, trips to Raleigh, North Carolina, identifying fingerprints to separate himself from the crimes committed by the defendant, ultimately [had] to get up and get a new social security number because he could never, ever repair his credit record.

J.A. 95. The district court further found that Hawes had committed crimes in Burke's name, "to such a degree that the people in the prison system, the lawful authorities dealing with him, didn't even known that he was doing so in the victim's name and identity." J.A. 96. Finally, the district court found that not only had Hawes assumed Burke's identity, he had, through his acts of theft, managed to "live[] the victim's life more fully than the victim did," and the court noted that it did not know

8

"of a single case that could be more egregious in that regard . . . ." Id.

Having concluded that an upward departure was warranted, the district court found that there was still "a need for an upward variance in this case, simply because the facts are so unusual and so aggravating." J.A. 94. Upon reviewing the factors set forth in 18 U.S.C. § 3553(a), the district court found the need for deterrence, the need for punishment, and the need to protect the public from future crimes to be significant factors in favor of an upward variance. Of particular import to the district court was the fact that Hawes continued to use Burke's identity and stole the identity of another victim following his indictment. In the district court's view, these actions demonstrated a lack of remorse or contrition. In the end, the district court concluded, "I don't think there are enough resources in the federal arsenal to accomplish [rehabilitation] with this defendant. But what I do know is the longer he's incarcerated, the fewer opportunities he'll have to do this to anyone else." J.A. 99. Accordingly, the district court sentenced Hawes to a term of imprisonment of 120 months. This appeal followed.

III.

A.

In <u>United States v. Booker</u>, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), the Supreme Court invalidated both 18 U.S.C. § 3553(b)(1), which made the Sentencing Guidelines mandatory, and 18 U.S.C. § 3742(e), which required appellate courts to conduct a <u>de novo</u> review of departures from the Guidelines. 543 U.S. at 260-62, 125 S. Ct. 738. As a result of the <u>Booker</u> decision, the Guidelines are now advisory, and appellate courts are limited to reviewing sentencing decisions to determine whether such sentences are "reasonable." <u>Gall v. United States</u>, 128 S. Ct. 586, 594, 169 L. Ed. 2d 445 (2007). As the Supreme Court has made clear, the "appellate 'reasonableness' review" required by <u>Booker</u> "merely asks whether the trial court abused its discretion." <u>Rita v. United States</u>, 127 S. Ct. 2456, 2465, 168 L. Ed. 2d 203 (2007).

Although the Guidelines are no longer mandatory, they remain "the starting point and the initial benchmark" for any sentencing decision. <u>Gall</u>, 128 S. Ct. at 596. Thus, in making a sentencing determination, the district court should begin by calculating the applicable Guidelines range. <u>Id.</u> As the Supreme Court has recognized, the advisory Guidelines range "reflect[s] a rough approximation of sentences that might achieve § 3553(a)'s objectives." <u>Kimbrough v. United States</u>,

10

128 S. Ct. 558, 574, 169 L. Ed. 2d 481 (2007). Consequently, using the advisory Guidelines range as a "starting point furthers Congress' desire for efficient administration and nationwide consistency in sentencing." United States v. Pauley, 511 F.3d 468, 473 (4th Cir. 2007).

Once the appropriate Guidelines range has been calculated, the district court should give the parties "an opportunity to argue for whatever sentence they deem appropriate." Gall, 128 S. Ct. at 596. The district court then should consider the factors set forth in § 3553(a) to determine whether such factors support the sentence requested by either party. Id. Those factors are as follows: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) "the kinds of sentences available"; (4) the kinds of sentence and the sentencing range established for "the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines" in effect

11

at the time of sentencing; (5) "any pertinent policy statement issued by the Sentencing Commission" which is in effect at the time of sentencing; (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (7) "the need to provide restitution to any victims of the offense." 18 U.S.C.A. § 3553(a). The statute further requires the sentencing court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Id.

In determining the appropriate sentence, the district court "may not presume that the Guidelines range is reasonable." Gall, 128 S. Ct. at 596-97; Rita, 127 S. Ct. at 2465 ("In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."). Rather, the court must make an individualized assessment, based upon the facts presented, and determine whether a sentence outside of the Guidelines is warranted. Gall, 128 S. Ct. at 597. If the district court decides to impose a non-Guidelines sentence, the court then "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. In Gall, the Supreme Court found

12

"it uncontroversial that a major departure should be supported by a more significant justification than a minor one." Id.

As the last step of the sentencing process, the district court must provide an adequate explanation of its sentencing decision "to allow for meaningful appellate review and to promote the perception of fair sentencing." Id. The district court "must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." Id. at 594. In explaining its sentencing decision, a district court is not required to "discuss each factor set forth in § 3553(a) in checklist fashion"; rather, "it is enough to calculate the range accurately and explain why (if the sentence lies outside it) this defendant deserves more or less." United States v. Moreland, 437 F.3d 424, 432-33 (4th Cir. 2006)(quoting United States v. Dean, 414 F.3d 725, 729 (7th Cir. 2005)) (internal quotation marks omitted).

On appeal, this Court reviews the reasonableness of the sentence imposed, whether the sentence is inside or outside the Guidelines range, "under a deferential abuse-of-discretion standard." United States v. Abu Ali, 528 F.3d 210, 260 (4th Cir. 2008) (quoting Gall, 128 S. Ct. at 591), pet. for cert. filed, 77 U.S.L.W. 3242 (Oct. 6, 2008). This review involves

13

two steps.  First, we must examine the sentence for "significant" procedural errors, such as "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentencing based on clearly erroneous facts, or failing to adequately explain the chosen sentence – including an explanation of the Guidelines range."  <u>Gall</u>, 128 S. Ct. at 597.

If the district court's decision is procedurally sound, we then consider whether the sentencing decision is substantively reasonable.  In conducting this review, we must "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range."  <u>Id.</u>  "Under this approach, the applicable guidelines range plays an important role."  <u>Abu Ali</u>, 528 F.3d at 261.  If the sentence is within the Guidelines range, we may presume that the sentence is reasonable, although such a presumption is not required.  <u>Gall</u>, 128 S. Ct. at 597.  If the sentence is outside of the Guidelines range, however, we "may not apply a presumption of unreasonableness."  <u>Id.</u>  "To hold otherwise would fatally undermine the Court's holding in <u>Booker</u>."  <u>Pauley</u>, 511 F.3d at 473.  In reviewing a non-Guidelines sentence, the appellate court "may consider the extent of the deviation, but must give due deference to the district court's decision that the

14

§ 3553(a) factors, on a whole, justify the extent of the variance." Gall, 128 S. Ct. at 597. "Even if we would have reached a different sentencing result on our own, this fact alone is 'insufficient to justify reversal of the district court.'" Pauley, 511 F.3d at 474 (quoting Gall, 128 S. Ct. at 597).

As always, when considering the reasonableness of a sentence, we review the district court's legal conclusions de novo and its factual findings for clear error. Abu Ali, 528 F.3d at 261.

B.

The first step in our review of Hawes' sentence is a determination of whether there were any significant procedural errors.

Hawes concedes that the district court committed no procedural errors in determining his sentence.[1] The parties are in agreement that the district court properly calculated the

_____

[1] We note that the district court did not offer Hawes an opportunity to allocute until after the court began to impose sentence. Failure to afford a defendant the opportunity to allocate is reversible error where it can be shown that an exercise of the right of allocution could have resulted in a lesser sentence. See United States v. Muhammad, 478 F.3d 247, 249-50 (4th Cir. 2007). Hawes does not challenge this aspect of his sentencing, however, and therefore, we consider this issue to have been waived on appeal.

Guidelines range to be 27 to 33 months' imprisonment. Upon calculating the applicable Guidelines range, the district court advised Hawes that it was considering an upward variance and/or departure and afforded the parties ample opportunity to argue their respective positions on the issue. The district court then considered the relevant Guideline departure provisions and the § 3553(a) sentencing factors and determined that the unique facts and circumstances of the case were sufficiently compelling to justify a sentence outside of the Guidelines.[2] Further, the district court provided an adequate explanation of its sentencing decision through its oral remarks during the sentencing hearing. Accordingly, we conclude that the sentence imposed on Hawes was procedurally sound.

## C.

Having found no significant procedural errors, we now must determine whether the sentence is substantively reasonable.

---

[2] While this Court previously has required a sentencing court to calculate a Guidelines departure sentence before considering the imposition of a variance sentence, see Moreland, 437 F.3d at 432, this two-step process no longer appears necessary under Gall, which merely requires the sentencing court to "consider the extent of the deviation and ensure that the justification is sufficiently compelling" to support a non-Guidelines sentence. 128 S. Ct. at 597.

16

Since Booker, the Supreme Court has stressed that the district court's sentencing decisions are entitled to due deference and should be overturned only where the district court has abused its discretion. See Rita, 127 S. Ct. at 2465; Gall, 128 S. Ct. at 597. In Gall, the Supreme Court rejected the proposition that the district court must apply a heightened standard of review to sentences outside the Guidelines range. Gall, 128 S. Ct. at 595. In so doing, the Court explicitly rejected any rule that would require "extraordinary" circumstances to justify a sentence outside the Guidelines range or which would use a "rigid mathematical formula" as a "standard for determining the strength of the justifications required for a specific sentence." Id. The Court stressed that "the abuse-of-discretion standard of review applies to appellate review of all sentencing decisions – whether inside or outside the Guidelines range." Gall, 128 S. Ct. at 596 (emphasis added).

This deferential standard of review requires appellate courts to recognize that, for any given case, there is a range of permissible sentences which may be deemed substantively reasonable. "[T]here is not a single reasonable sentence but, rather, a range of reasonable sentences. Consequently, reversal will result if – and only if – the sentencing court's ultimate determination falls outside the expansive boundaries of that universe." United States v. Martin, 520 F.3d 87, 92 (1st Cir.

17

2008) (citation omitted). "A sentencing court abuses or exceeds its discretion when its decision . . . cannot be located within the range of permissible decisions." United States v. Cutler, 520 F.3d 136, 157 (2d Cir. 2008)) (quoting United States v. Canova, 485 F.3d 674, 679-80 (2d Cir. 2007)) (internal quotation marks omitted). Because there is a range of permissible outcomes for any given case, an appellate court must resist the temptation to "pick and choose" among possible sentences and rather must "defer to the district court's judgment so long as it falls within the realm of these rationally available choices." United States v. McComb, 519 F.3d 1049, 1053 (10th Cir. 2007), cert. denied, 128 S. Ct. 1917, 170 L. Ed. 2d 778 (2008); see also United States v. Carter, 538 F.3d 784, 790 (7th Cir. 2008) (noting substantive reasonableness "contemplates a range, not a point").

Appellate courts also "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Gall, 128 S. Ct. at 597. Such deference is justified because a district judge "is in a superior position to find facts and judge their import under § 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." Id. "It is not for the Court of Appeals to decide de

18

novo whether the justification for a variance is sufficient or the sentence reasonable." Id. at 602.

Of course, the high degree of deference afforded a district court's sentencing decision does not render appellate review meaningless. "Gall did not substitute a regime of total unreviewability for the fallen regime of Guidelines rigidity." Abu Ali, 528 F.3d at 266. As this Court stated in Moreland, "'reasonableness' is not a code-word for 'rubber stamp.'" 437 F.3d at 433. "The 'totality of the circumstances' substantive reasonableness calculus demands that we proceed beyond a formalistic review of whether the district court recited and reviewed the § 3553(a) factors and ensure that the sentence caters to the individual circumstances of a defendant, yet retains a semblance of consistency with similarly situated defendants." Evans, 526 F.3d at 167 (Gregory, J., concurring). Such review is to ensure that the district court has not merely provided "lip service" to the § 3553(a) factors, but rather has given reasonable weight to such factors as the individual circumstances of the case require, so as to achieve the purposes of sentencing as set forth in § 3553(a), and has not given weight to improper factors. With these principles in mind, we now turn to the sentence imposed upon Hawes in the present case.

19

D.

1.

In his appellate brief, Hawes first contends that the district court erred in failing to justify adequately the extent of its departure from the top of the applicable Guidelines range. Specifically, Hawes relies upon United States v. Dalton, 477 F.3d 195 (4th Cir. 2007), in support of his argument that the district court failed to adopt an incremental approach through the criminal history categories or offense levels to reach the appropriate sentence.

In Dalton, this Court remanded for re-sentencing on the grounds that the district court in upwardly departing from the Guidelines range did not "employ the incremental approach dictated by [U.S.S.G.] § 4A1.3(a)(4)(B)." Id. at 199. This Guidelines provision governs upward departures from Criminal History Category VI and requires district courts to "structure the departure by moving incrementally down the sentencing table to the next higher offense level in Criminal History Category VI until it finds the guidelines range appropriate to the case." Id. Dalton is not binding in the present case, however, as the district court which sentenced Hawes did not base its decision for upward departure upon § 4A1.3(a)(4)(B), nor was Hawes within Criminal History Category VI. As such, Hawes' reliance on Dalton is simply misplaced.

20

2.

Hawes further argues in his brief to this Court that the district court's sentence is "unreasonable on its face" because the variance imposed was 264% above the applicable Guidelines range. The Supreme Court in <u>Gall</u>, however, explicitly rejected the use of such a "rigid mathematical formula . . . as the standard for determining the strength of the justifications required for a specific sentence." 128 S. Ct. at 595. Thus, the fact that a sentence is 200%, or even 300%, above the Guidelines range does not render a sentence unreasonable per se. Rather, as the Supreme Court instructed, the relevant inquiry is whether the justification for such deviation is "sufficiently compelling to support the degree of the variance." <u>Id.</u> at 597. As such, the fact that Hawes' sentence was well above the Guidelines' range, while relevant, does not of itself render the district court's decision substantively unreasonable.

3.

Finally, Hawes argues that the district court's sentence creates an unwarranted disparity among similar defendants convicted of similar crimes, and that this disparity is so severe that it requires that his sentence be vacated. In so arguing, Hawes points this Court to a recent data report of the Sentencing Commission detailing the median sentence and median

departure in identity fraud cases nationwide since the Supreme Court's decisions in <u>Gall</u> and <u>Kimbrough</u>. The fact that Hawes' sentence may be more severe than the average sentence imposed in identity fraud cases nationally does not establish that the district court's sentence in the present case failed to address the "need to avoid unwarranted sentence disparities" recognized in § 3553(a)(6). That is not to say that statistical information is never relevant to the sentencing calculus; indeed, it is precisely this type of information -- the typical sentencing range for the typical defendant charged with a particular offense -- which the Sentencing Guidelines themselves seek to provide. "[B]y devising a recommended sentencing range for every type of misconduct and every level of criminal history, the Guidelines as a whole embrace 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" <u>United States v. Johnson</u>, 445 F.3d 339, 343 (4th Cir. 2006) (quoting 18 U.S.C. § 3553(a)(6)).

The determination of an appropriate sentence in any particular case requires an *individualized* assessment of the facts and circumstances presented by that particular defendant. While Hawes argues that the Court should consider statistical data regarding the median sentence imposed on defendants convicted of similar crimes in reviewing his sentence, such data

22

does not provide the particulars of the defendants who were sentenced and the crimes they committed. As such, this data does not provide the information necessary to determine whether the defendants who received such sentences are truly comparable to the defendant at hand. As this Court found in United States v. Abu Ali, 528 F.3d 210 (4th Cir. 2008), a defendant should be compared only to other defendants with similar circumstances and histories. Id. at 267. Because the Court cannot possibly determine the circumstances and histories of each individual defendant whose sentences comprise this statistical information, the assignment of dispositive weight to this type of data would be antithetical to the notion of the individualized assessment required for fashioning an appropriate sentence for a particular defendant.

In imposing Hawes' sentence, the district court calculated the advisory Guidelines range, but ultimately concluded that this case fell "outside the heartland" of those cases to which the advisory Guidelines range was intended to apply. See Rita, 127 S. Ct. at 2465. Indeed, the district court found that this case warranted both a departure under Application Note 19 of U.S.S.G. § 2B1.1 and a variance under § 3553(a). Application Note 19 provides that an upward departure may be warranted in an identity fraud case where:

(I)     The offense caused substantial harm to the victim's reputation or credit record, or the victim suffered a substantial inconvenience related to repairing the victim's reputation or a damaged credit record.

(II)    An individual whose means of identification the defendant used to obtain unlawful means of identification is erroneously arrested or denied a job because an arrest record has been made in that individual's name.

(III)   The defendant produced or obtained numerous means of identification with respect to one individual and essentially assumed that individual's identity.

U.S.S.G. § 2B1.1, app. note 19(A)(vi).  As the district court properly found, all three elements were clearly satisfied in this case.

First, there can be no doubt that Hawes' actions of identity fraud caused substantial harm and inconvenience to his victim.  In the more than ten years during which Hawes stole Burke's identity, Hawes incurred unpaid medical bills, credit card debt, telephone bills, cable bills, and child support obligations in Burke's name, all of which harmed Burke's reputation and credit record.  Burke's credit record was so damaged that Burke was forced to obtain a new Social Security number.  Burke testified extensively regarding the substantial inconvenience and stress he suffered as a result of Hawes' conduct.  Burke testified that he could never completely clean up his credit report because "new things would pop up all the

24

time. So it was a never-ending nightmare." J.A. 45. He described how "the collection agencies became the worst," as they continued to call him for over ten years for the unpaid bills that Hawes incurred in his name. J.A. 45-46. Burke testified that for several years, collection agencies called him at home and at work on a daily basis. Burke estimated that he spent "thousands of hours" trying to repair his credit record. J.A. 46.

Hawes' actions also caused his victim financial hardship. Burke testified that because his credit was destroyed, he had to pay 22 percent interest for a car loan, far higher than he should have paid. Burke further testified that he had to pay higher interest on credit cards, and he could not be the primary borrower on his home mortgage. Based upon this evidence, the district court did not err in concluding that Hawes had caused substantial harm and inconvenience to his victim.

Second, the evidence establishes that Hawes stole Burke's Social Security card and birth certificate, and that he used these means of identification to obtain a driver's license in Burke's name. Hawes later committed numerous felonies using Burke's identity, and he was arrested, convicted, and incarcerated for these crimes. As a result of the substantial criminal record incurred in his name, Burke was denied a job opportunity that would have paid him more than $20,000 more per

25

year than he had been earning at the time. Burke further testified that the criminal record compiled by Hawes had a chilling effect on his career over the past ten years because he was afraid to leave jobs. Burke was forced to travel to Raleigh to be fingerprinted so that state authorities could compare his fingerprints to those on every arrest record that Hawes had caused authorities to open in Burke's name. Despite Burke's efforts, his current job at Bank of America was delayed for more than one month due to the existence of this criminal record.

Third, the evidence reflects that Hawes obtained numerous means of identification with respect to Burke and essentially assumed his identity for more than a decade. Hawes obtained a driver's license in Burke's name using stolen documents. Using Burke's identity, Hawes married a woman in North Carolina, fathered a child, and incurred child support obligations. Hawes abandoned this family and moved to South Carolina, where he fathered another child with another woman while still pretending to be Burke. As Burke testified, "it wasn't a case of him just stealing my identity to get a credit card and spend[ing] a bunch of money; he took on my identity. He was living as me in every shape and form." J.A. 51.

Based upon these facts, the district court was correct in determining that an upward departure was warranted pursuant to Application Note 19 of § 2B1.1. "When the district court

26

imposes a non-Guidelines sentence based on a correct application of the Guideline departure provisions, the resulting sentence reflects the judgment of <u>both</u> the district court <u>and</u> the Commission that a non-Guidelines sentence is appropriate." <u>Evans</u>, 526 F.3d at 165 n.4.

In addition to finding that an upward deviation was justified pursuant to Application Note 19 of U.S.S.G. § 2B1.1, the district court found that the § 3553(a) sentencing factors as a whole justified a deviation from the Guidelines in this case. In so finding, the district court considered the specific "nature and circumstances of the offense," 18 U.S.C.A. § 3553(a)(1). Specifically, the district court found that Hawes had stolen Burke's identity for more than a decade and had caused Burke substantial harm and inconvenience during this time. The district court further considered the "history and characteristics of the defendant." <u>Id.</u> Of particular import to the district court was the fact that Hawes absconded after his indictment. The district court was especially troubled by the fact that Hawes not only continued to steal Burke's identity while he was a fugitive, but that he also stole the identity of another person. Additionally, when Hawes was finally arrested and confronted by Secret Service agents, Hawes dismissed the gravity of the harm he had inflicted upon Burke, stating that Burke "didn't have a very good life to begin with." J.A. 62.

27

The district court found that Hawes' actions following his indictment showed a profound lack of remorse, and that the "need for . . . deterrence in this case is greater than any case I've seen in 11 years on the bench." J.A. 98. The district court further opined that "[t]here is no rehabilitation possible for [a] person who so disdains his fellow man as to do what he's done over and over and over." J.A. 99.

While Hawes does not contest that the district court was entitled to depart from the Guidelines range in this case, he argues that the extent of the deviation itself was unreasonable. We cannot agree. Based upon the unique facts presented, the district court concluded that a sentence of 120 months' imprisonment was necessary in order "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence," and "to protect the public from the further crimes of the defendant." 18 U.S.C.A. § 3553(a)(2). We find that the district court did not abuse its discretion in this regard. While we may have imposed a different sentence than the one chosen by the district court, we cannot say that the decision to impose a sentence of 120 months' imprisonment falls outside the range of rational choices available to the court. See Pauley, 511 F.3d at 474. "Although the deviation from the Guidelines range in this case clearly is significant, the district court provided 'significant justification' for the

28

degree of the deviation, which is all that is required." <u>Evans</u>, 526 F.3d at 163 (affirming sentence of 125 months for defendant convicted of identity fraud, where sentence constituted 300% upward deviation from advisory Guidelines range). For these reasons, we conclude that Hawes' sentence is substantively reasonable.

IV.

After careful review, we are satisfied that the district court's decision to impose a non-Guidelines sentence of 120 months' imprisonment was sufficiently justified under the circumstances. Accordingly, we affirm the judgment of the district court.

<u>AFFIRMED</u>